NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

MAR–LEN CABINETS, INC.,
Respondent.

No. 79–7453.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 8, 1980.

Decided Oct. 19, 1981.

Rehearing Denied Nov. 25, 1981.

between the United Brotherhood of Carpenters and Joiners of America and two employer associations, the first covering employees installing cabinets at various construction jobsites (the "outside agreement"), and the second covering employees manufacturing cabinets at respondent's shop (the "inside agreement").

When the master agreements expired, respondent sought to negotiate separate more favorable agreements with the union. The negotiations broke down. The union brought an unfair labor practice charge alleging respondent had violated § 8(a)(1) & (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) & (5), by instituting unilateral changes in the wages and working conditions of outside employees without first complying with the notice requirements of Section 8(d) of the Act, and by bargaining in bad faith with respect to a new inside agreement.

The National Labor Relations Board found in favor of the union, and now seeks enforcement of its order. We deny enforcement to the extent the order is based on a finding that respondent violated the notice provisions of the Act, but enforce it in other respects.

Ruah Lahey, Washington, D. C., for petitioner.

Stephen J. Schultz, Merrill & Atkinson, San Diego, Cal., for respondent.

Before BROWNING, Chief Judge, ALARCON, Circuit Judge, and HAUK,* District Judge.

PER CURIAM:

Prior to 1977, respondent Mar-Len Cabinets, Inc. was a non-party signatory to two master collective bargaining agreements

## I. THE OUTSIDE AGREEMENT

The agreement between respondent and the union provided that a party desiring to change or cancel the agreement must give written notice to the other 60 days before the agreement expired. By letter dated March 4, 1977 Respondent informed the Union that it did not wish to continue to be bound by the master outside agreement, due to expire June 15, 1977. No notice was sent to state or Federal mediation services. No negotiations followed.

On March 22, 1977, the union notified the employer association parties to the master outside agreement that it wished to reopen the agreement. Copies of this notice were sent to state and Federal mediation serv-

* Honorable A. Andrew Hauk, District Judge, United States District Court for the Central District of California, sitting by designation.

ices. A new master agreement was negotiated between the union and the employer associations. Respondent did not participate in these negotiations.

The union subsequently informed respondent that it considered respondent bound by the newly negotiated master agreement. The union took the position that respondent's March 4th notice was ineffective because respondent had not notified the mediation services. Respondent told the union it did not consider itself bound by the new master agreement and sought to initiate negotiations for a separate agreement. The union refused to negotiate.

On August 8, 1977, respondent notified state and Federal mediation services that a labor dispute existed. On August 19, 1977, respondent unilaterally adopted its proposed contract changes, raising the wages of its outside employees and abolishing union security.

The Board found respondent had violated its duty to bargain collectively under Section 8(a)(5), 29 U.S.C. § 158(a)(5), by terminating the agreement without continuing its terms for 60 days after notifying the mediation services of the dispute, as required by Section 8(d), 29 U.S.C. § 158(d).[1]

Respondent challenges the Board's order on four grounds.

■ 1. Respondent contends it was not required to wait 60 days after giving the 8(d)(3) notice before implementing its bargaining proposals because the waiting period is required only before a strike or lockout. Section 8(d)(4) provides that the party desiring to modify the contract continue "in full force and effect . . . all the terms and conditions of the existing contract . . ." until the waiting period has passed. 29 U.S.C. § 158(d)(4). This wording plainly prohibits a unilateral departure from the terms of the contract whether or not a strike or lockout follows, as the Senate Committee report on § 8(d) confirms: "Should the notice not be given on time . . . it becomes an unfair labor practice for an employer *to change any of the terms or conditions* specified in the contract for 60 days *or* to lock out his employees. Similarly, it is an unfair labor practice by a union to strike before the expiration of the 60-day period." S.Rep. No. 105, 80th Cong., 1st Sess. 24 (1947) (emphasis added), *reprinted in* 1 NLRB, Legislative History of the Labor Management Relations Act, 1947, 407, 430 (1948).

2. Respondent asserts the union's absolute refusal to bargain on the outside agreement relieved respondent of any obligation to bargain collectively, including any duty to notify the mediation services.

■ Respondent relies upon the dictum in *Times Publishing Co.*, 72 NLRB 676, 683 (1947) that "a union's refusal to bargain in good faith may remove the possibility of negotiation and thus preclude the existence of a situation in which the employer's own good faith can be tested." The notice provision is not concerned with "good faith;" it is designed to give the mediation services time to intervene before disruptive econom-

---

1. Section 8(d) provides in relevant part:

[W]here there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;
(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;
(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territory agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and
(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later.

ic action is taken by one of the parties. *Amax Coal Co. v. NLRB*, 614 F.2d 872, 889 (3d Cir. 1980). This purpose would be hindered, not served, if the duty to give notice disappeared when the non-initiating party refused to bargain. It is in just such a case that the need for mediation may be most pressing.

■ 3. Respondent contends that by rejecting its cancellation notice the union became the "initiating party," and thus bore the burden of giving notice. Section 8(d) provides that "no party to [a collective-bargaining] contract shall terminate or modify such contract, unless the party desiring such termination or modification ... (3) notifies the Federal Mediation and Conciliation Service ...." 29 U.S.C. § 158(d) & (d)(3). This language places the burden of notifying the agencies on the first party seeking to terminate or modify the contractual arrangement. *United Furniture Workers of America v. NLRB*, 336 F.2d 738, 741 (D.C.Cir.1964). The union's refusal to agree to the modification desired by respondent did not affect this obligation. Respondent's contention, like the argument rejected in *United Furniture Workers*, is to the:

effect that the burden shifts in accordance with the twistings and turnings of the bargaining negotiations. Such a construction seems to us, however, to be fraught in the highest degree with the peril that the public interest in the emollient intervention of the mediation services will fall between the two stools of contending parties wholly intent upon the uncertain—and frequently fluctuating—fortunes of their negotiating positions. It is a peril which can be avoided by assigning a fixed and definite responsibility for notifying the public agencies. Congress has made that assignment and, not surprisingly, it is to the party who starts the process.

4. Finally, respondent argues it was relieved of its duty to notify the services because the union had already notified them. The Board's response is that the initiating party's duty to mail the required notices is absolute and can not be shifted.

The cases cited by the Board are not in point. They hold only that the initiating party must bear the adverse consequences if no notice is given, or the notice given is untimely. No court has held that the initiating party must send a second notice when the non-initiating party has already notified the mediation agencies.

Congress' principle concern in enacting Section 8(d) was to give the mediation services time to intervene in an effective manner. This goal would not be advanced by requiring the initiating party to give notice after the other party had done so.

■ The initiating party remains at risk, however, if the notice sent by the other party was ineffective to apprise the mediation services of the particular dispute. *Amax Coal Co. v. NLRB, supra*, 614 F.2d at 889. The Board did not reach this issue because it concluded that respondent's duty to notify could not be affected by any union notification. Therefore we will remand the case to the Board so it can rule on the effectiveness of the notification given to the mediation services by the union.

## II. THE INSIDE AGREEMENT

### A. *Withdrawal of Recognition.*

The Board found respondent violated Section 8(a)(5) and (1) by unlawfully withdrawing recognition from the union and thereafter refusing to bargain with the union.

■ The union enjoyed a rebuttable presumption of majority support, *NLRB v. Tahoe Nugget, Inc.*, 584 F.2d 293, 297 (9th Cir. 1978), and respondent's withdrawal of recognition established a prima facie case of unlawful refusal to bargain. *NLRB v. Top Manufacturing Co.*, 594 F.2d 223, 224 (9th Cir. 1979). Respondent could rebut this presumption by showing either that the union had in fact lost its majority status or that its withdrawal of recognition was based upon a good faith doubt of the union's continued majority status. *Ibid.* The Board found respondent did not meet its burden.

Respondent points out that none of the employees joined in the picket line established by the union and that four of the six inside employees resigned from the union and returned to work. In addition, some employees expressed dissatisfaction with the union's failure to report bargaining developments and to respond to questions about the consequences of working behind the picket line. However, there was sufficient evidence supporting the Board's conclusions that the employees resigned from the union to avoid potential fines, not to oust the union as a bargaining representative, and that they crossed the picket line and returned to work as a means of preserving a continuity of income because of economic necessity, and not because they rejected union representation. *See NLRB v. Top Manufacturing Co.*, 594 F.2d 223, 224–25 (9th Cir. 1979). The board was also justified in concluding that the expressions of dissatisfaction, taken in context, did not indicate repudiation of the union but only displeasure with the union's handling of the bargaining negotiations. *Ibid.*

■ The Board also concluded respondent's doubt of the union's majority status was not asserted in good faith. "Reasonable doubt as to majority status must only be asserted in good faith and may not be raised in the context of an employer's activities aimed at causing disaffection from the Union." *Clear Pine Mouldings, Inc. v. NLRB*, 632 F.2d 721, 730 (9th Cir. 1980). The record supports the Board's finding that the resignations from the Union were a direct result of respondent's failure to fulfill its statutory obligation to bargain in good faith.

B. *Failure to Bargain in Good Faith.*

■ The Board found that "[r]espondent failed to bargain in good faith concerning the terms and conditions of employment for employees in the inside unit." This finding is supported by substantial evidence on the record considered as a whole.

Respondent claims it was willing to negotiate further over its proposals, but "the strike ended the bargaining." *See Neon Sign Corp. v. NLRB*, 602 F.2d 1203, 1205 (5th Cir. 1979). Respondent, however, took the initiative in cancelling the last bargaining session, claiming the union had lost its majority support. We agree with the Board that "if the negotiations became truncated in a manner depriving Respondent of a full opportunity to bargain over non-economic matters, the fault lies primarily with Respondent."

The Board based its finding of bad faith upon the conclusion that respondent made proposals "with the object in mind of forcing a breakdown in negotiations." Respondent proposed an extremely strong "management rights" package that would have required the union effectively to abrogate its representation of the employees. Respondent proposed to establish a no-strike/no-picket policy; to abolish union security, the right of union representatives to visit the plant, and super-seniority for shop stewards; to deny the employees' rights to arbitration of grievances and to respect picket lines; and to relieve respondent of its duties to notify the union of new hiring, to hire first through the union hiring hall, and to contribute to the union pension fund.

■ We should be cautious in inferring motivation from proposal content since " '[t]here are too many reasons why an employer who is willing to contract with a union might wish to . . . maintain an open shop' " *K-Mart Corp. v. NLRB*, 626 F.2d 704, 706 (9th Cir. 1980) (*quoting Cox, The Duty to Bargain in Good Faith*, 71 Harv.L. Rev. 1401, 1419 (1958)). Nevertheless, proposal content supports an inference of intent to frustrate agreement where, as here, the entire spectrum of proposals put forward by a party is so consistently and predictably unpalatable to the other party that the proposer should know agreement is impossible.

Although the respondent proffered economic justifications in support of its "management rights" package, the Board found "the cost implications were so theoretical and marginal as to be pretextual." The economic justification offered in support of

respondent's proposal to delete the union-security clause is illustrative. Respondent contended that the union was applying the clauses in an unlawful manner, and that retention of the clause could be expected to lead to litigation, and thus expense, for respondent. There was no convincing documentation showing that the union was applying the clause in an illegal manner. We have reviewed the record and agree with the Board that respondent was "grasping at straws" in speculating over the potential litigation cost of retaining the clause. These circumstances supported an inference of bad faith. "Patently improbable justifications for a bargaining position will support an inference that the position is not maintained in good faith. By the same token, 'adhering to an untenable legal position during the course of negotiations is inconsistent with the obligation to bargain in good faith.'" *Queen Mary Restaurants Corp. v. NLRB*, 560 F.2d 403, 409 (9th Cir. 1977) (quoting *Fraser & Johnston Co. v. NLRB*, 469 F.2d 1259, 1263 (9th Cir. 1972)).

The finding that the respondent did not bargain with the intent of reaching an agreement is also supported by events surrounding the withdrawal of recognition. When the union called a strike, respondent advised several employees they would have to resign from the union to return to work. Respondent typed a letter of resignation for one employee and furnished postage and mailed letters of resignation for two others. Contrary to respondent's contention, these events occurred prior to the last bargaining session at which respondent withdrew recognition.

Finally, the Board relied upon respondent's "declared objective of going 'nonunion.'" The Board found this "declaration" in a letter written by respondent to the union shortly before the master agreement expired. The letter stated, "we do not wish to continue in the union, however we are willing to sit at the bargaining table and bargain with you if you wish." Although the letter is ambiguous, we cannot say the Board's interpretation is improbable, especially in light of subsequent events.

Accordingly, the Board properly considered the letter as evidence of bad faith.

ENFORCEMENT is GRANTED in part and DENIED in part, and the case RE-MANDED in part to the Board for further preceedings in accordance with this opinion.