NATIONAL LABOR RELATIONS
BOARD (NLRB), Petitioner,

v.

WILDER CONSTRUCTION CO.,
INC., Respondent.

No. 85–7679.

United States Court of Appeals,
Ninth Circuit.

Submitted Sept. 5, 1986.[*]

Decided Nov. 21, 1986.

---

[*] The NLRB requested that the appeal be submitted without oral argument and Wilder offered no objection to the request. The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a) and Ninth Circuit Rules 3(f) and (d).

Howard E. Perlstein, Atty., N.L.R.B., Washington, D.C., for petitioner.

Bruce Bischof, Bischof & Hungerford, Sunriver, Or., for respondent.

Before FLETCHER, FERGUSON, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

Wilder Construction appeals the decision by the National Labor Relations Board (NLRB) holding that the company's unilateral withdrawal of recognition of the union representing its workers interfered with the employees' right to bargain through representatives of their own choosing and constituted a breach of the company's corollary duty to bargain, in violation of sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act. 29 U.S.C. §§ 158(a)(1) & (a)(5) (1982). The NLRB also found that the company's subsequent refusal to provide the union with the information it requested regarding employees in the bargaining unit violated the Act. The NLRB's decision and order were based upon substantial evidence; the order is enforced.

## Facts

In 1974, Wilder Construction recognized General Teamsters Local No. 231, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, as the exclusive collective bargaining representative of a unit that includes truckdrivers, mechanics, and warehousemen. The company entered into successive collective bargaining agreements after that time, the most recent being an agreement from June 1, 1980, through May 31, 1983. The union and company met on several occasions to discuss terms of a new contract but failed to reach agreement.

The union began a strike on August 29, 1983. On that date, the company employed 14 people in the bargaining unit. All were

members of the union and all joined the strike. During the first three weeks of the strike, the company hired 12 permanent replacements. Sometime prior to October 11, 1983, 3 of the 14 union members crossed the picket line and returned to work.

On October 11, the company notified the union by letter that it was withdrawing recognition. The company asserted in its letter that it had a good faith doubt that the union commanded the support of a majority of the bargaining-unit employees. After that time, Wilder refused the union's requests to bargain.

On November 18, the union made an unconditional offer to return to work on behalf of the striking employees. The company answered that it had permanently replaced the employees, but offered to place any of them so desiring on a preferential hiring list. Five striking employees accepted the company's offer.

Almost six months later, on May 11, 1984, the union requested a list of the names, social security numbers, addresses, dates of hire and termination, if applicable, of the bargaining-unit employees. Wilder refused to furnish the requested information.

Based upon these facts, the National Labor Relations Board found that the company violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act by withdrawing recognition from, and refusing to bargain with, the union. The NLRB also found that the refusal to provide the union with the requested information violated the Act.

## Discussion

### 1. General Framework for Withdrawal of Recognition Claims

■ Once a union is certified by the NLRB or recognized by the employer, the union is conclusively presumed to command majority allegiance for a reasonable period; after such period, there is a rebuttable presumption of majority support. *See Mingtree Restaurant, Inc. v. NLRB,* 736 F.2d 1295, 1296–97 (9th Cir.1984). The presumption becomes rebuttable, for example, after a contract expires. *See, e.g., NLRB v. Vegas Vic, Inc.,* 546 F.2d 828, 829 (9th Cir.1976), *cert. denied,* 434 U.S. 818, 98 S.Ct. 57, 54 L.Ed.2d 74 (1977). A company's withdrawal of recognition establishes a prima facie case of an unlawful refusal to bargain. *See NLRB v. Mar-Len Cabinets, Inc.,* 659 F.2d 995, 998 (9th Cir.1981). There is a continuing duty on the employer to recognize and to bargain with the union until the presumption of majority support is rebutted. *NLRB v. Tahoe Nugget, Inc.,* 584 F.2d 293, 297 (9th Cir.1978), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 290 (1979). Here, the employer seeks to rebut the presumption of union majority support by showing that it had a serious doubt as to the union's majority status at the time it refused to bargain. An employer may justify a refusal to bargain with the incumbent union by establishing a "good faith doubt" defense. *See id.*[1]

---

1. We note that even where the employer meets the presumption of union majority support by presenting evidence establishing a good faith reasonable doubt as to the union's majority status, the employer has not necessarily presented a complete defense on the merits. Technically, once the employer meets the presumption, the "burden then shift[s] to the Board to prove that the Union represented a majority on the day the [company] refused to bargain." *Dalewood Rehabilitation Hospital, Inc. v. NLRB,* 566 F.2d 77, 80 (9th Cir.1977). The General Counsel may present evidence establishing the unfair labor practice even though the employer has succeeded in overcoming the presumption. However, because the General Counsel usually rests on the presumption alone, as he did in this case, the employer's rebuttal of the presumption is often enough to permit it to prevail on the merits. *See generally Atlanta Journal Company,* 82 NLRB 832 (1949) (establishing original principle governing good faith doubt defenses); *Celanese Corp. of America,* 95 NLRB 664 (1951) (cited with approval in *Brooks v. NLRB,* 348 U.S. 96, 104, 75 S.Ct. 176, 181, 99 L.Ed. 125 (1954)) (establishing the presumption of majority support and barring good faith doubt defense when employer engages in unfair labor practices serving to reduce the union's strength); *Stoner Rubber Company, Inc.,* 123 NLRB 1440, 1445 (1959) (justifying the evidentiary presumption and noting that if an employer would interrogate workers as to their support of the union directly that,

The test for establishing a good faith doubt is an objective one. Evidence in support of that defense must "unequivocally indicate that union support had declined to a minority." *NLRB v. Silver Spur Casino*, 623 F.2d 571, 579 (9th Cir. 1980), *cert. denied*, 451 U.S. 906, 101 S.Ct. 1973, 68 L.Ed.2d 294 (1981). An employer must have more than a subjective belief regarding the lack of majority support; it must prove that at the time it withdrew recognition, it had "knowledge of ... facts which give a reasonable basis for doubting the union's majority." *Tahoe Nugget*, 584 F.2d at 299. The evidence presented by the employer must be "clear, cogent, and convincing." *See id.* at 297. This evidentiary standard applies to every element of the employer's defense. The NLRB's decision as to whether the test is met will be upheld if it is supported by substantial evidence. *Silver Spur*, 623 F.2d at 579.

## 2. The NLRB's Findings

### a. The number of employees in the unit

The NLRB found that as of the date on which the company withdrew recognition the unit was comprised of 26 employees— the fourteen original workers and the twelve permanent replacements. Based upon its contention that four of the union members had permanently left the unit, the company asserts that by October 11 the unit was comprised of only 22 people. The employer's burden with respect to issues regarding the composition of the unit is the same as that which applies to all other aspects of its defense—its evidence must be "clear, cogent, and convincing."

#### 1) Retired workers

Wilder contends that three of the union employees retired and were no longer part of the bargaining unit. The NLRB found, however, that the evidence presented was "far too equivocal" to establish Wilder's knowledge of the retirement of the three employees before it withdrew recognition from the union. Because the employer must have such knowledge *before*

in itself, could constitute an unfair labor prac-

the withdrawal of recognition, any information acquired after withdrawal is not relevant. *See N.T. Enloe Memorial Hospital v. NLRB*, 682 F.2d 790, 794 (9th Cir.1982). The company's witness, its vice-president, did not establish when he found out about the retirements and admitted that the workers had not informed him of their plans. Moreover, the affidavit supplied by him to the NLRB three months after the withdrawal of recognition did not include the retirements as a reason for the company's good faith doubt. The NLRB reasonably found that the company's evidence was "insufficient to establish that [the] three employees either lost their status as employees or as strikers as of the date that the Company withdrew recognition." Thus the company failed to show by "clear, cogent and convincing" evidence that it had knowledge of facts that "unequivocally indicate[d]" that the three individuals no longer were part of the bargaining unit.

#### 2) Employee who found work elsewhere

The company also asserts that the NLRB erred by counting as a part of the bargaining unit one striker who allegedly found permanent employment elsewhere. The NLRB held, however, that Wilder had failed to demonstrate that the striker accepted the new employment before its withdrawal of recognition. The company's operations manager testified that the employee in question went to work for another company either during the strike or shortly thereafter. Because the strike continued for more than a month after the withdrawal of recognition, the NLRB found that the company failed to establish that the employee's alleged acceptance of permanent employment occurred on or before the date of withdrawal. Thus, facts introduced by the company fell far short of meeting the strict test applicable when a "good faith doubt" defense is asserted.

#### 3) Conclusion

The NLRB's determination that on the relevant date the bargaining unit consisted of 26 employees, the 14 original strikers

tice).

and the 12 permanent replacements, is supported by substantial evidence.

### b. The allegiance of the three returning strikers who crossed the picket lines

Because the unit consisted of 26 workers, in order to establish a good faith reasonable doubt as to the union's majority status Wilder was required to show by clear, cogent, and convincing evidence that it had knowledge of facts that would unequivocally demonstrate that more than 13 workers had rejected the union's representation. Thus, even were we to assume—contrary to authoritative precedent—that none of the permanent replacements supported the union, the company had the burden of showing its knowledge of facts that would prove that at least some of the original workers had disavowed the union as their bargaining representative. *Cf. Pennco, Inc.,* 250 NLRB 716 (1980) (holding that there is a presumption that permanent replacements support the union in the same proportion as the employees in the relevant unit), *enforced* 684 F.2d 340 (6th Cir.), *cert. denied,* 459 U.S. 994, 103 S.Ct. 355, 74 L.Ed.2d 392 (1982). Prior to the company's unilateral withdrawal of recognition, three striking employees crossed the picket line and returned to work. Whether these three maintained their allegiance to the union could, were we to disregard *Pennco,*[2] be critical in determining the majority status of the union. The NLRB ruled that the company "lacked a reasonable, objective basis for doubting the Union's majority status" because the company "ha[d] not shown that any of the original complement of 14 employees rejected continued representation by the Union." Its ruling is supported by substantial evidence. Indeed, any other conclusion, without evidence of an explicit repudiation of union membership and a rejection of the union as the exclusive bargaining agent, would be unwarranted and unreasonable.

 The mere refusal to support a strike is not tantamount to a rejection of union representation. *See NLRB v. Top Manufacturing Co., Inc.,* 594 F.2d 223, 225 (9th Cir.1979). In *NLRB v. Mar-Len Cabinets, Inc.,* 659 F.2d 995 (9th Cir.1981), we evaluated a similar conclusion by the NLRB that employees who crossed a picket line did not reject the union's representation. In *Mar-Len,* we upheld the conclusion that these employees "crossed the picket line and returned to work as a means of preserving a continuity of income because of economic necessity, and not because they rejected union representation." 659 F.2d at 999. Moreover, we approved of the conclusion that some employees in *Mar-Len* resigned their union membership to avoid potential fines and "not to oust the union as a bargaining representative." *Id.* *See also Celanese Corp. of America,* 95 NLRB 664, 674 (1951) ("We are well aware of the fact that individual employees may abandon a strike and return to work for personal reasons wholly unrelated to any disavowal of their union as their collective bargaining representative."). No specific factual findings by the NLRB are necessary to support such conclusions; nor is it necessary that there be any evidence in the record that would justify such factual findings. In cases in which an employer asserts a good faith doubt defense, the presumption of allegiance to the union survives an employee's return to work through a picket line unless the employer offers "clear, cogent, and convincing" evidence that, in doing so, the individual intended to terminate the union's services as his bargaining representative and that the employer had reason to be aware that such was the individual's intent.

 Because workers may resign union membership during a strike in violation of a union's internal rules, *Pattern Makers' League v. NLRB,* 473 U.S. 95, 105 S.Ct. 3064, 87 L.Ed.2d 68 (1985) (upholding the NLRB's interpretation of the Act), the

---

**2.** We do not intend to indicate any doubt as to the validity of the established rule of *Pennco.* Since the Board, however, chose not to rest its decision on *Pennco,* we do not think it appropriate—or necessary in this case—to rely on that decision.

most reasonable conclusion to draw if a worker does not exercise this option is that he has chosen to maintain his union affiliation. Moreover, even a formal resignation will not automatically be equated with a rejection of the union as the exclusive bargaining agent. *See Mar-Len,* 659 F.2d at 999. The burden still remains upon the employer to demonstrate clearly and convincingly that the resignations were motivated by a desire to oust the union as the exclusive bargaining agent and not solely by the reasons ordinarily underlying such action, such as economic necessity, concern over future employment, or a desire to avoid penalties or fines.

The NLRB's determination that the workers involved did not reject the union's representation by their mere crossing of the picket line is supported by substantial evidence.[3] Knowledge on the part of an employer of the crossing of picket lines by employees is insufficient to give rise to a good faith doubt as to the allegiance of those employees to the union for purposes of collective bargaining. Any other holding would endanger the section 7 rights of striking workers as well as workers who do cross the picket line.

## CONCLUSION

The NLRB's finding that the union maintained majority support in the 26 member bargaining unit is supported by substantial evidence. The company failed to meet the good faith doubt test. Consequently, Wilder's refusal to bargain and its denial of the union's request for information each constitute unfair labor practices in violation of the Act.

ORDER ENFORCED.

---

**3.** The NLRB properly rejected Wilder's contention that the workers' crossing of the line sometime after the occurrence of picket line violence evidenced rejection of union representation.

The existence of picket line violence, standing alone, will not ordinarily be held to be the basis for inferring a rejection of union representation by those who work behind the line. *See IT Services,* 263 NLRB 1183 (1982). As the NLRB noted in *Pennco, Inc.,* 250 NLRB 716 (1980), "in view of the speculative nature of the employees' reasons for crossing the picket line, the occurrence of some violence on the picket line is, *at best,* one factor weakening the presumption of majority status but not alone rebutting it." *Id.* at 718 n. 16 (emphasis added). We cannot presume from the mere crossing of the line subsequent to incidents of violence that the workers intended to "oust the union as a bargaining representative." *Mar-Len,* 659 F.2d at 999.