JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, demandante y peticionaria, *v.* JOSÉ LUIS VELÁZQUEZ, H.N.C. FINCA SEGUNDO DISTRITO AGUADA (CENTRAL COLOSO), demandados y recurridos.

*Número:* JR-89-650        *Resuelto:* 29 de junio de 1990

---

(3)  Art. 741 del Código Civil, 31 L.P.R.A. sec. 2367; Art. 105 de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2355.

*Luis B. Osorio Díaz*, abogado de la peticionaria; *Federico Rodríguez Pagán*, abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Para arribar a una correcta y justa decisión en torno a si en la mesa de negociaciones una de las partes ha actuado o no de mala fe, la Junta de Relaciones del Trabajo de Puerto Rico (la Junta) viene obligada a examinar todo el cuadro emergente, en particular lo que de ordinario constituye uno de los aspectos más cruciales: *las propuestas y contrapropuestas económicas.* Expongamos los antecedentes procesales pertinentes.

## I

El 25 de agosto de 1987, la Junta emitió una Decisión y Orden en la que concluyó que José Luis Velázquez, h.n.c. Finca Segundo Distrito Aguada, Central Coloso (Patrono), había violado el Art. 8(1)(a) y (d) de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 69, al negarse a reunir con el Sindicato Puertorriqueño de Trabajadores (Unión), a los fines de negociar un convenio colectivo que reemplazara el que expirara en 1985. Como remedio a dicha infracción, en esta primera decisión ordenó al Patrono a negociar y a *conferirle efecto retroactivo a enero de 1986 al convenio colectivo, si alguno, que se negocie. Exhibit* A, pág. 1.

Posteriormente, el 10 de agosto de 1989, la Junta adoptó un Informe de 23 de junio de 1989 de otro Oficial Examinador que concluyó que el Patrono *no* había cumplido con esa Decisión y Orden. A tenor con la recomendación del Oficial Examinador, la Junta acudió a este Foro a solicitar que la pusiéramos en vigor. Ello origina nuestra intervención mediante Orden de Mostrar Causa.

En su comparecencia, el Patrono cuestiona con vehemencia la suficiencia en derecho de la prueba en que la Junta fundamentó la determinación del incumplimiento de su obligación de negociar de *buena fe* con la Unión. Plantea, además, como infracciones al debido procedimiento de ley, la inclusión en el récord de ciertas comunicaciones *ex parte* enviadas por la Unión a la Junta quejándose de su conducta durante las negociaciones. Cabe puntualizar que la corrección de la Decisión y Orden en la que se

le encontró incurso en negativa a negociar no fue cuestionada por el Patrono. Por ende, no está en disputa en esta instancia.

## II

De entrada, un análisis del expediente administrativo nos permite concluir que, al presente, las diferencias entre las partes que han impedido un acuerdo feliz se centran en las cláusulas de "Taller" o membresía en la Unión y las relativas al Fondo de Beneficencia y Pensiones, y al Fondo de Orientación y Seguro de Vida. La conclusión del Oficial Examinador de la Junta de que el patrono está negociando de mala fe se funda en su negativa a acceder, *"sin fundamento económico o de otra índole"*, a renovar dichas cláusulas tal y como aparecen en el convenio colectivo expirado. (Énfasis suplido.)

Dirimir justamente el planteamiento en revisión sobre suficiencia de la prueba exige una sinopsis del estado de la negociación a la fecha de la vista que sirvió de fundamento al informe. Veamos.

De dicho informe surge que durante 1981 a 1985 existió un convenio colectivo entre la Unión y el Patrono —sucesor de la Corporación Azucarera— en el que éste se obligó a contribuir $0.35 al Fondo de Beneficencia y Pensiones de la Unión y $0.20 al Fondo de Orientación y Seguro de Vida por cada tonelada de caña que se cortase en la finca y se convirtiese en azúcar durante la vigencia del convenio.[1] Al expirar el convenio en diciembre de 1985, *el Patrono se negó a negociar con la Unión, acción que dio*

---

[1] En su testimonio ante la Junta de Relaciones del Trabajo de Puerto Rico (la Junta), el Administrador del Patrono declaró que estas aportaciones se redujeron a $0.17 y $0.10, respectivamente, en el Convenio negociado en 1984 y que venció el 31 de diciembre de 1985.

El Oficial Examinador no hizo conclusión de hecho al respecto. En su análisis, al contrastar la propuesta del Patrono con la cláusula que aparece en el convenio, la compara con los $0.35 y $0.20 respectivamente antes aludidos.

De hecho, la posición de la Unión —al insistir en que se mantenga la cláusula antes mencionada como estuvo en los últimos años— parece referirse a los $0.35 y $0.20, y no a las cantidades de $0.17 y $0.10 a que aparentemente se habían reducido las aportaciones. Para propósitos decisorios y por las razones expuestas más adelante, no es necesario resolver este conflicto entre la prueba y las conclusiones del Oficial Examinador.

*lugar a la antes aludida Decisión y Orden de 25 de agosto de 1987.* Subsiguientemente, desde 1987 a 1988, las partes se reunieron en varias ocasiones sin lograr un acuerdo.(2) Desde el inicio de las negociaciones, el patrono se ha mantenido firme en su propuesta de sólo aportar $0.20 al Fondo de Beneficiencia por cada tonelada de caña y de reducir de $0.10 a $0.05 su aportación al Fondo de Orientación. Por su parte, la Unión ha sostenido su posición de que el convenio se renueve en *todos sus términos* y, por ende, mantener inalterada la aportación patronal.

La prueba testifical del Patrono, *no controvertida*, refleja que su oferta económica a base del tonelaje de caña cortada *equivale a unas cantidades comparables o superiores a lo pactado por la Unión con otros patronos por conceptos similares.* A manera de ejemplo, en 1988 su aportación sería de $1,200 para el Fondo de Beneficiencia, más $400 para el Fondo de Orientación, lo que es *superior* a la suma global de $1,200 aportados a la Unión por otro colono que opera en el área circundante. Dichas propuestas, argumenta el Patrono, son razonables a la luz de lo anterior y de los beneficios obtenidos por éste durante el período 1985 a 1987, a saber, $10.00 en 1985, $7,801.00 en 1986 y $11,034.00 en 1987.(3)

En cuanto a la cláusula de taller unionado, cabe señalar que el convenio expirado les requería a todos los obreros ser o hacerse miembros de la Unión al comenzar a trabajar. Como variante, el Patrono ahora propone que los obreros existentes vengan obligados a continuar siendo miembros de la Unión, *pero los nuevos tendrían la opción de no ingresar*, no empece a que sí vendrían obligados a pagar cuotas a la Unión.(4)

---

(2) Surge del expediente que también se reunieron en 1989, esto es, con posterioridad a la vista celebrada en la Junta en diciembre de 1988, sin resultado alguno.

(3) A la fecha de la vista no había cifras precisas para 1988.

(4) Con *posterioridad* a la vista, el Patrono modificó su posición de tal forma que la diferencia entre las partes se limita, en esencia, al requerimiento del Patrono a que la Unión acepte resarcirle por cualquier reclamación de cualquier empleado despedido a petición de ésta por no estar al día en el pago de sus cuotas.
*Nuestra decisión, claro está, tiene que fundarse en los hechos al momento de la vista.*

## III

■ Lo expuesto refleja indubitadamente que por un período de tiempo extenso ha existido y todavía subsiste un estancamiento (*impasse*) en las negociaciones en lo que respecta a ambos asuntos. Ello no significa necesariamente que una de las partes esté negociando de mala fe. Negociar de buena fe es conducta que obliga a las partes a considerar y sopesar las propuestas razonables y, generalmente, a estar dispuestos a ceder o modificar las ya sometidas a la luz de las contrapropuestas, con miras a lograr un acuerdo. *La nota característica es la reciprocidad.*

El factor tiempo ha tornado muy compleja la situación del caso de autos. Es evidente que *tanto* la Unión como el Patrono se han mantenido firmes e inflexibles en sus respectivas posiciones desde septiembre de 1987 a diciembre de 1988, *sin presentar propuestas alternas*. La Unión insiste en que el Patrono acepte mantener inalteradas las tres cláusulas, y éste reitera una y otra vez su única propuesta.

■ Y es que debemos reconocer que la dinámica obrero-patronal en esta área es muy fluida. En ocasiones —sea por razones económicas o para aprovechar alguna debilidad de la otra parte en términos del poder de regateo— será legítimo que el patrono o la organización obrera busque concesiones de la otra parte. Ello, por sí solo, no constituye negociación de mala fe. *Rescar, Inc.*, 274 N.L.R.B. 1, 118 L.R.R.M. 1371 (1985); *Atlanta Hilton & Tower*, 271 N.L.R.B. 1600 (1984). Asimismo, en ausencia de evidencia de actos de discrimen *gremial o de actos del Patrono dirigidos a socavar el respaldo de los empleados hacia la Unión*, un tranque en las negociaciones necesariamente no significa que se esté negociando de mala fe. Si bien el rechazo de las propuestas de la otra parte, así como su naturaleza y razonabilidad, son elementos a considerar al evaluar la totalidad de la conducta de una parte que alegadamente no está negociando de buena fe, como regla general tal negativa no es suficiente por sí sola para

establecer la comisión de una práctica ilícita de trabajo de no negociar de buena fe. *Reichhold Chemicals, Inc.*, 288 N.L.R.B. 69 (1988).

En cuanto al extremo de las aportaciones al fondo unional en el caso de autos, las razones económicas aducidas por el Patrono para justificar sus propuestas para un convenio de tres años que habrá de ser retroactivo a enero de 1986 no son arbitrarias de su faz. Tampoco parecen ser meros pretextos, al punto que podamos inferir que fueron hechas con miras a frustrar la negociación. Máxime si recordamos que la Unión *no presentó prueba para refutar* las razones económicas aducidas por el Patrono para buscar modificaciones a las cláusulas originalmente negociadas por su predecesora, la Corporación Azucarera. Sobre el particular, la ausencia de contrapropuestas de la Unión ciertamente dificulta evaluar, más allá del récord ante nos, las verdaderas intenciones del Patrono. *N.L.R.B. v. Mar-Len Cabinets, Inc.* 659 F.2d 995, 999 (1981); *Seattle-First Nat. Bank v. N.L.R.B.*, 638 F.2d 1221 (1981).

■ Ahora bien, la situación en cuanto a la conducta del patrono en torno a la cláusula de taller —en este caso de taller cerrado— es *distinta*. Del récord no surgen las razones por las cuales éste ha insistido en cambiarla desde 1987. Tampoco que le haya ofrecido a la Unión explicación alguna para querer variar una cláusula tan antigua en el convenio. Definitivamente este asunto es vital para la Unión en términos de matrícula y, por ende, de capacidad para actuar en forma efectiva, solidaria y organizada frente a los retos que se le presenten. La intransigencia del Patrono durante todo ese tiempo en cuanto a la cláusula de Taller —que no le representa erogación económica significativa— y sin razón aparente o explicación alguna, es factor decisivo en la determinación de si se ha estado negociando de buena fe.

La propuesta eliminación de esa cláusula implicaría que aquellos empleados nuevos, o que comenzaron a trabajar en 1986, tendrían que pagar cuotas a la Unión pero no vendrían obligados a hacerse miembros y, como consecuencia, a cumplir con sus reglas y reglamentos. Esa propuesta evidentemente pretende

evitar que la Unión crezca y debilitar así su posición ante sus miembros. Esta conclusión es compatible con su negativa inicial en 1986 a reconocer la Unión, cuando alegaba que ésta ya no representaba a la mayoría de los empleados. Tal contención nunca la probó. Esa actitud prevaleció hasta septiembre de 1987. La seriedad y los efectos de esa conducta es obvia: *durante todo este tiempo los empleados han estado, y aún continúan, sin un convenio colectivo formal.*

El vacío —creado por el Patrono— de por sí es suficiente para socavar la posición de la Unión. El *impasse* resultante por su postura de modificar la cláusula de taller ha sido uno de los ingredientes más significativos.

En resumen, la totalidad de la prueba sometida es suficiente en derecho para sostener que José Luis Velázquez, h.n.c. Finca Segundo Distrito de Aguada, se ha negado a negociar de buena fe con la Unión conforme la Decisión y Orden de la Junta fechada el 25 de agosto de 1987.

En estas circunstancias, acceder a la petición de la Junta —ante el fracaso de las partes en llegar a un acuerdo tras la expiración hace cuatro años del convenio, y donde la corrección de la decisión emitida en 1987 es clara e incuestionable— es el único camino compatible con el espíritu del interés público inmerso en la Ley de Relaciones del Trabajo de Puerto Rico.

■ Finalmente, el debido procedimiento de ley no requiere que la Junta, *en todos los casos,* celebre una vista posterior para determinar si se ha cumplido o no con determinada Decisión y Orden como paso previo a solicitarnos que se ponga en vigor. El error planteado, pues, no se cometió.

En consecuencia, se dictará sentencia que acceda a ponerla en vigor.(5)

---

(5) El planteamiento procesal del Patrono no tiene mérito. Es cierto que la Unión escribió en varias ocasiones a la Junta alegando que él no estaba cumpliendo con su decisión sin enviarle copia. Sin embargo, la determinación de la Junta se tomó tras la celebración de una vista en la que el Patrono tuvo la oportunidad de presentar evidencia a su favor y refutar el contenido de dichas comunicaciones. Asimismo, pudo examinar y

El Juez Presidente Señor Pons Núñez y el Juez Asociado Señor Hernández Denton disintieron sin opiniones escritas. El Juez Asociado Señor Rebollo López no intervino.

---

refutar ante nos lo expuesto en una carta enviada por la Unión luego de finalizada la vista, la cual fue referida al Oficial Examinador mediante moción del abogado de la Junta.

Sobre ésta no aparece del Informe del Oficial Examinador que hubiese sido tomada en consideración. La comparación hecha en el informe entre ciertas cláusulas del convenio expirado y la propuesta del Patrono no recoge los asertos de la Unión en cuanto a unas alegadas nuevas propuestas del Patrono. Al contrario, las propuestas reseñadas en el informe son las hechas por el Patrono antes de la vista celebrada el 1ro de diciembre de 1988.