**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CAYUGA CRUSHED STONE, INC., Respondent.**

No. 240, Docket 72–1631.

United States Court of Appeals, Second Circuit.

Argued Dec. 20, 1972.

Decided March 8, 1973.

Roger Hartley, Atty., N. L. R. B. (Peter G. Nash, Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Elliott Moore, Atty., Washington, D. C., of counsel), for petitioner.

James L. Burke, Elmira, N. Y., for respondent.

Before MOORE, MULLIGAN and TIMBERS, Circuit Judges.

MULLIGAN, Circuit Judge:

The National Labor Relations Board has petitioned this court pursuant to Section 10(e) of the National Labor Relations Act, as amended (29 U.S.C. § 160(e)), to enforce its order of February 23, 1972 (195 N.L.R.B. No. 108) against Cayuga Crushed Stone, Inc. (Cayuga). The Board affirming the Trial Examiner, found that Cayuga had violated Sections 8(a)(1) and (5) of the Act (29 U.S.C. §§ 158(a)(1) and (5)) by withdrawing recognition of the International Union of Operating Engineers, Local 545 and the International Brotherhood of Teamsters, etc., Local 65, as joint representatives of its employees, before a reasonable period of bargaining had taken place. As an alternative ground, the Board found that Cayuga had insufficient evidence upon which it could question the Unions' representative status. Since the Board's findings are based on substantial evidence, we grant enforcement of the Board's order directing that Cayuga cease and desist from further violations, bargain with the Unions and post the usual notices of the proceedings.

Cayuga is engaged in quarrying, crushing and selling crushed stone in South Lansing, New York. On March 29th and 30th, 1971, nine of thirteen employees constituting a concededly appropriate bargaining unit,[1] signed union authorization cards. Eight of the employees designated the Operating Engineers and one the Teamsters as their representative for collective bargaining purposes. The Unions promptly advised Cayuga in a joint letter on March 30, 1971 that they represented a majority of the employees at the quarry in South Lansing and requested recognition as Bargaining Representative for the pur-

---

1. The thirteen member unit consisted of all employees at Cayuga's Portland Point plant, except clerks, guards and supervisors.

pose of entering a collective bargaining agreement concerning wages, hours and working conditions. The Unions also filed a pétition dated April 5th with the Board requesting an election. By letter dated April 6th the Board notified Ca-' yuga of the petition. The letter advised Cayuga of its right to be represented by counsel, adverted to the right of its employees to election information and requested certain data from Cayuga. On April 6th or 7th, 1971, Mr. Besemer, Cayuga's General Manager, met with representatives of the two Unions and although there was a refusal by the Unions to show the authorization cards to him, he accepted their majority representation and orally agreed to sign a recognition agreement. On April 9th, 1971, the agreement was executed. In essence, it provided that Cayuga recognized the two Unions as bargaining agents and agreed to commence negotiation of a collective bargaining agreement.

Since Cayuga had agreed to recognize the Unions, Besemer told a Union representative to cancel the petition for certification. The Unions withdrew the petition and the Board advised Cayuga of this fact on April 15th.

The parties met on April 12th, April 29th and May 18th discussing job classifications, pension plans and, at the last meeting, a 16 page contract presented by the Unions. Agreement was reached only on the question of the assignment of overtime work. A May 27th meeting was cancelled and it is undisputed that on or about June 1st, Cayuga determined to withdraw recognition of the Unions. Subsequent efforts by the Unions to communicate with Cayuga, including a further Union demand letter dated June 15th, proved unsuccessful.

The alleged reason for the failure of Cayuga to continue negotiations was its belief that the Unions no longer represented a majority of the employees in the unit. Cayuga's position that the Unions had lost majority support was primarily based on Besemer's testimony that one employee, Rogers, had indicated that in his view a majority of the workers were not happy with the Unions. Rogers wrote to the Board stating:

> I and my fellow employees . . . do not have a Union. We find out [sic] that our boss has agreed to have the Teamsters and Engineers represent us. Most of us do not want this.
>
> Will you please send me forms so that we can send them in, and have an election.

The Board responded by letter dated June 15th indicating that if the employer had recognized the Unions at a time when the Unions did not represent a majority of the employees they could file a charge: "If you feel there has been a violation of the Act, contact this office and you will be given assistance in filling out and filing of [sic] a charge." Rogers showed his letter as well as the Board's response to Besemer.

On June 11, 1971, the Unions jointly filed an unfair labor practice charge, and the General Counsel issued a complaint against Cayuga on August 10, 1971. At the hearing held on October 5, 1971, the sole [2] issue to be determined was whether or not Cayuga had refused to bargain in violation of Section 8(a)(5) of the Act. The Board found that Cayuga's refusal, on June 15, 1971 and thereafter, to bargain at the Unions' request constituted such a violation.

■ We think the Board's finding that Cayuga had in fact no reasonable basis to question in good faith the Unions' majority status is amply supported by the record. (See NLRB v. Rish Equipment Co., 407 F.2d 1098, 1101 (4th Cir. 1969); NLRB v. Master Touch Dental Laboratories, Inc., 405 F.2d 80,

---

2. Cayuga which initially raised jurisdictional questions with respect to the appropriate determination of the time interval for measuring its annual interstate sales (i. e., most recent calendar year versus 12 months immediately preceding the hearing), has withdrawn its objection and concedes jurisdiction. See NLRB v. George J. Roberts & Sons, Inc., 451 F.2d 941, 944 (2d Cir. 1971).

82–83 (2d Cir. 1968)). Rogers, the employee, admittedly could not speak for the majority of the members of the unit and his feeling that most of the members did not want the union, was in effect a personal reaction without any objective substantiation. After the issuance of the order here Cayuga did file a "Motion to Allow Submission of New Evidence" on April 21, 1972. The motion was based upon the receipt of a letter from all of the affected employees announcing that they all had second thoughts about signing the cards and "feel a Union could not help us at this time." The Board treated the motion as one for reconsideration of the Decision and Order and denied it as lacking in merit. The Board cited Franks Bros. Co. v. NLRB, 321 U.S. 702, 705, 64 S.Ct. 817, 819, 88 L.Ed. 1020 (1944), for the proposition that " 'a bargaining relationship once rightfully established must be permitted to exist and function for a reasonable period in which it can be given a fair chance to succeed.' "

■ There is no doubt that if the bargaining relationship between the employer and the Unions had been established by Board certification after an election, the representative status of the Unions absent unusual circumstances would be irrebuttably presumed to continue for one year and after that time the presumption could be rebutted. Brooks v. NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954). The Board has not fixed any period of mandated collective bargaining where uncertified unions are involved but has maintained that the employer must bargain for a reasonable time. Here the Board found that the three bargaining meetings lasting not more than ten hours, in a one month period, were not adequate.

■ There is no doubt but that an election supervised by the Board which is conducted secretly and presumably after the employees have had the opportunity for thoughtful consideration, provides a more reliable basis for determining employee sentiment than an informal card designation procedure where group pressures may induce an otherwise recalcitrant employee, to go along with his fellow workers. It is further true that Justice Frankfurter in *Brooks* referred to the solemnity of the election and decertification process in approving the so-called "one year certification" rule of the Board. 348 U.S. at 99, 75 S. Ct. 176. The Court also recognized the fact that the one year rule was not applied by the Board or the courts either before or after the Taft-Hartley Act where the collective bargaining relationship was established by card check rather than a certification election. 348 U. S. at 101 n. 9, 75 S.Ct. 176. See also NLRB v. Gissel Packing Co., 395 U.S. 575, 598–599 & n. 14, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). There is, however, no intimation in the cases that a voluntary recognition after a card check designation, which admittedly creates a lawful bargaining status for the Unions, can be unilaterally disregarded before there has been an opportunity for a reasonable period of bargaining. The rationale of *Brooks*, as well as the holdings in other circuits [3] in fact compel the conclusion that the Unions' status must be recognized for a reasonable period despite the loss of majority employee support.

From the record it appears that a majority of the employees had voluntarily signed cards which in unambiguous language designated the Unions as representatives for the purpose of collective bargaining. The employer had freely entered into an agreement recognizing the status of the Unions as bargaining agents. Both employer and employees were fully cognizant of their rights.

---

3. See NLRB v. Frick Co., 423 F.2d 1327 (3d Cir. 1970); NLRB v. San Clemente Publishing Corp., 408 F.2d 367 (9th Cir. 1969); NLRB v. Montgomery Ward & Co., 399 F.2d 409 (7th Cir. 1968); NLRB v. Universal Gear Serv. Corp., 394 F.2d 396 (6th Cir. 1968).

Certainly the employer would have access to counsel who could have advised it of the right to demand an election[4] if there was any question of lack of majority support.

■ Having voluntarily determined that the Unions had a majority status which entitled them to recognition as the representatives of its employees and having foregone the right to request an election, we cannot accede to the proposition that the employer can now unilaterally determine that the Unions no longer represent a majority of the employees and refuse to bargain with them. It may well be that as of April, 1972, Cayuga did have a reasonable basis to determine objectively that the Unions had lost majority status. However, this was after almost a year of failure on the part of Cayuga to negotiate. While the Board here has not found that Cayuga has committed any other unfair labor practices, the refusal to bargain itself, except for a few preliminary meetings, erodes the status of the Unions and discourages union membership. Franks Bros. Co. v. NLRB, 321 U.S. 702, 704, 64 S.Ct. 817, 88 L.Ed. 1020 (1944).

We agree that there is an interest in and policy in support of the principle that employees should have a freedom in selecting or rejecting bargaining representatives. However, as *Brooks* recognized, there is a competing interest in providing stability for bargaining relationships which have been lawfully established. While the procedures giving rise to recognition here were not clothed in the solemnities of an election, there is nothing suspect in the agreements which were freely chosen by the parties who voluntarily rejected the formal election proceedings. It is within the Board's discretion to determine that the status thus created is entitled to some reasonable period of gestation rather than the abortion proposed.[5] The Board has here been charged with the responsibility of accomplishing the purposes of the National Labor Relations Act and the determination to proceed by ordering bargaining for a reasonable time as well as determining what a reasonable time should be, is properly a decision for the Board and judicial intervention is not appropriate. See NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); cf. Brooks v. NLRB, 348 U.S. 96, 103, 75 S.Ct. 176, 99 L.Ed. 125 (1954).

The order of the Board will be enforced.

4. In NLRB v. Gissel Packing Co., 395 U.S. 575, 591, 89 S.Ct. 1918, 1928 (1969) the Court noted the Board's abandonment of the *Joy Silk* doctrine (Joy Silk Mills, Inc., 85 N.L.R.B. 1263 (1949), enforced, 185 F.2d 732, 87 U.S.App.D.C. 360 (1950)) and sanctioned the new Board policy:

When confronted by a recognition demand based on possession of cards allegedly signed by a majority of his employees, an employer need not grant recognition immediately, but may, unless he has knowledge independently of the cards that the union has a majority, decline the union's request and insist on an election, either by requesting the union to file an election petition or by filing such a petition himself under § 9(c)(1)(B).

5. We note that this rule appears to be in accord with a general Board policy of protecting validity established bargaining relationships during their embryonic stages. See, e. g., Montgomery Ward, 62 L.R.R.M. 1642 (1966); Keller Plastics Eastern, Inc., 157 N.L.R.B. 583 (1966).