**ROYAL COACH LINES, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 114, 316, Dockets 87–4036, 87–4056.**

United States Court of Appeals, Second Circuit.

Argued Sept. 30, 1987.

Decided Jan. 27, 1988.

Joseph S. Rosenthal, New York City (Bondy & Schloss, New York City, of counsel), for petitioner.

Michael David Fox, N.L.R.B., Washington, D.C. (Rosemary M. Collyer, Gen. Counsel, John D. Burgoyne, Asst. Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for respondent.

Before VAN GRAAFEILAND, MESKILL and NEWMAN, Circuit Judges.

MESKILL, Circuit Judge:

Petitioner Royal Coach Lines, Inc. (Royal Coach) seeks review of a decision and order of the National Labor Relations Board (Board), pursuant to section 10(f) of the National Labor Relations Act (Act), 29 U.S. C. § 160(f) (1982). The respondent Board has filed a cross-application seeking enforcement of its order, pursuant to section 10(e) of the Act, 29 U.S.C. § 160(e). In its decision and order, the Board found petitioner guilty of an unfair labor practice in violation of sections 8(a)(1) and 8(a)(5) of the Act, 29 U.S.C. §§ 158(a)(1), (5) (1982). *See Royal Coach Lines, Inc.*, 282 N.L.R.B. No. 145 (Feb. 5, 1987). The Board ordered petitioner to engage in collective bargaining with representatives of Local 1181–1061 of the Amalgamated Transit Union, AFL–CIO (union). We grant review of the Board's decision and order and we deny enforcement.

## BACKGROUND

The facts in this case are drawn from the findings of an Administrative Law Judge (ALJ), as adopted by the Board in its subsequent decision. Petitioner Royal Coach is a corporation located in Yonkers, New York, and engaged in the business of providing school bus transportation. In April and May of 1982, the time period at issue here, Royal Coach employed fifty-five people, fifty-three of whom were eligible for membership in an appropriate bargaining unit. In April, Richard Eppolito, an organizer and business representative for the union, spoke with Beniamino F. DiPaolo, the president and sole stockholder of Royal Coach, and obtained permission to approach employees on petitioner's business premises to discuss union representation.

On May 10, 1982, Eppolito met with DiPaolo at the company's office. During that meeting, Eppolito informed DiPaolo that he had obtained authorization cards from a majority of petitioner's employees, indicating that they wanted the union to represent them in collective bargaining. At that time, however, Eppolito actually held cards signed by only twenty-three of the fifty-three employees eligible for membership in the appropriate bargaining unit. There is no evidence that DiPaolo asked to see the

cards or to verify their authenticity. Eppolito said that DiPaolo could voluntarily recognize the union as the sole bargaining agent of Royal Coach's employees or the union would petition the Board for an election to have the union certified. DiPaolo expressed interest in voluntary recognition and Eppolito provided him with the language from the union's standard recognition agreement. DiPaolo told Eppolito that subject to consultation with an attorney, he would execute a voluntary recognition agreement that Eppolito could pick up the next day. Eppolito picked up the signed agreement on May 11.[1]

Sometime after the May 10 meeting, Eppolito obtained six more authorization cards that, together with the previous twenty-three cards, indicated union support by a majority of Royal Coach's employees. Those cards were dated May 11, the day DiPaolo signed and tendered the written voluntary recognition agreement. The evidence presented to the ALJ was inconclusive as to whether the additional six cards were signed by the employees before or after DiPaolo's formal execution of the May 11 agreement.

Within a few days, Eppolito contacted DiPaolo and expressed interest in meeting to commence negotiations for a collective bargaining agreement. DiPaolo responded that his employees had informed him that they no longer wished to be represented by a union. On June 10, Eppolito again attempted to initiate negotiations with DiPaolo, but was rebuffed. On July 16, an attorney for DiPaolo sent a letter to the union indicating that the employees at Royal Coach did not wish to be represented by the union. Accompanying the letter was a petition dated June 1 and signed by forty of the fifty-three employees in the appropriate unit. The petition read:

> We, the undersigned employees of Royal Coach Lines Inc. of 798 Nepperhan Ave, Yonkers, N.Y. are *very disgruntled* with the attempted infiltration of the Union into our company.
>
> We, the undersigned, *wish not* to be represented by *any Union*.

There is no claim that the petition was unlawfully obtained by DiPaolo or any other representative of Royal Coach.

On July 21, the union filed the unfair labor practice charge that ultimately led to this litigation. On August 20, following an investigation, the Board's Regional Director issued a complaint alleging that petitioner had failed and refused to bargain with the union following its voluntary recognition, in violation of sections 8(a)(1) and 8(a)(5) of the Act. Following a two day hearing, the ALJ, in an opinion dated April 28, 1983, dismissed the complaint against petitioner. After detailing his factual findings, the ALJ held that "in a refusal to bargain case, the [Board's] General Counsel has the burden of proving the union's majority." Based on the evidence adduced before him, the ALJ concluded that the General Counsel had failed to satisfy that burden. First, the ALJ found that "at the time recognition was demanded, [the union did not] represent a majority of [petitioner's] employees." Second, the evidence was inconclusive as to whether the six authorization cards dated May 11 were signed before or after the execution of the voluntary recognition agreement. The ALJ therefore concluded that petitioner had not been subject to an enforceable duty to bargain and had not committed an unfair labor practice.

---

1. The agreement, which was dated and signed May 11, read:

   Local 1181–1061, Amalgamated Transit Union, AFL–CIO 101–49
   Woodhaven Boulevard, Ozone Park, New York 11416
   *Attention: Mr. John Ambrosio, President*
   Gentlemen:
   This is to advise you that Royal Coach, Inc. hereby recognizes Local 1181–1061, Amalgamated Transit Union, AFL–CIO as the collective bargaining representative for all full time and regular part time employees and shop employees employed by Royal Coach, Inc. at its Yonkers facility, excluding all supervisors, guards and clerks.
   We agree to commence negotiations with you immediately for the purpose of entering into a collective bargaining agreement on behalf of the aforesaid employees.
   Very truly yours,
   /s/ Ben DiPaolo

On February 5, 1987, nearly four years after the ALJ's decision, a three member panel of the Board reversed the ALJ's dismissal of the complaint against petitioner. Although the Board adopted the ALJ's factual findings, it concluded that he had erroneously construed applicable legal standards. The Board rejected the ALJ's suggestion that the burden of proving the union's majority status in such a case rested upon the General Counsel. Rather, the Board held that "in an 8(a)(5) proceeding such as this, the burden is on the ... party seeking to escape the bargaining obligation normally arising from voluntary recognition, to adduce affirmative evidence proving the union's lack of majority status at the time of recognition." 282 N.L.R.B. No. 145, at 3 (citing *Fertilizer Co. of Texas*, 254 N.L.R.B. 1382, 1382 n. 2 (1981); *Tri–City Meats, Inc.*, 231 N.L.R.B. 768, 768 n. 2 (1977); *E.L. Rice & Co.*, 213 N.L.R.B. 746, 748–50 (1974), enf'd, 524 F.2d 1148 (6th Cir.1975); *Moisi & Son Trucking, Inc.*, 197 N.L.R.B. 198, 198 n. 2 (1972)). The Board concluded that "[n]o such evidence was presented here," characterizing as "merely speculative" the evidence as to the relative timing of the May 11 authorization cards and the signing of the May 11 recognition agreement. The Board made no mention of Eppolito's misrepresentation of majority status at the May 10 meeting with DiPaolo.

The Board went on to hold that "where, as here, an employer has validly extended recognition to a union, the union is entitled to an irrebuttable presumption of majority status until a reasonable time for bargaining has elapsed." 282 N.L.R.B. No. 145, at 3–4 (citing *Rockwell International Corp.*, 220 N.L.R.B. 1262, 1263 (1975); *Keller Plastics Eastern, Inc.*, 157 N.L.R.B. 583, 587 (1966)). Having already decided that the May 11 written recognition agreement was valid and inescapable, the Board then concluded that petitioner refused to bargain with the union before a reasonable time had elapsed. Thus, by virtue of the irrebuttable presumption of majority status, the Board deemed irrelevant any evidence of dwindling employee support for the union at Royal Coach.

## DISCUSSION

The principal issue we must address is whether the Board was correct in concluding that petitioner had no legitimate grounds to question the union's majority status and thus committed an unfair labor practice when it refused to bargain after it had signed a voluntary recognition agreement. To resolve this issue, we must decide when evidence that a union lacks majority support may be considered and who should bear the burden of persuasion on that issue. Of course, "if the Board's construction of ... [the Act] is reasonably defensible, it should not be rejected merely because [we] ... might prefer another construction." *Truck Drivers Local Union No. 807 v. NLRB*, 755 F.2d 5, 7 (2d Cir.) (citing *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979)), cert. denied, 474 U.S. 901, 106 S.Ct. 225, 88 L.Ed.2d 225 (1985). The Board's interpretation should only be set aside if it is " 'fundamentally inconsistent with ... the Act.' " *Ford Motor Co.*, 441 U.S. at 497, 99 S.Ct. at 1849 (quoting *American Ship Building Co. v. NLRB*, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965)). As for the Board's adoption and application of presumptions, we may review such steps "both 'for consistency with the Act, and for rationality.' " *NLRB v. Baptist Hospital, Inc.*, 442 U.S. 773, 787, 99 S.Ct. 2598, 2606, 61 L.Ed.2d 251 (1979) (quoting *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 501, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978)).

The problems surrounding employer recognition of unions that enjoy less than majority support were discussed by the Supreme Court in *International Ladies' Garment Workers' Union v. NLRB (Bernhard–Altmann Texas Corp.)*, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961). The Court in *Bernhard–Altmann* considered whether such recognition is an unfair labor practice by the employer, in violation of section 8(a)(2) of the Act. The discussion in *Bernhard–Altman* is illuminating with respect to fundamental policies underlying the Act. In concluding that recognition of a minority union is indeed a violation of the

Act, the Court noted that one of the primary dangers of such a practice is that a union could use the recognition as "a deceptive cloak of authority with which to persuasively elicit additional employee support." *Id.* at 736, 81 S.Ct. at 1607. Anointing a minority of workers with such authority is a "clear[ ] abridgment of § 7 of the Act, assuring employees the right 'to bargain collectively through representatives of their own choosing' or 'to refrain from' such activity." *Id.* at 737, 81 S.Ct. at 1607 (quoting section 7, 29 U.S.C. § 157 (1982)). *See also NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers,* 434 U.S. 335, 344–45, 98 S.Ct. 651, 657–58, 54 L.Ed. 2d 586 (1978). Moreover, as the Supreme Court also made clear in *Bernhard–Altmann,* recognition improperly founded on minority support cannot be ratified by a subsequent showing of a union majority. If the agreement is, in the first instance, "obtained under [an] erroneous claim of majority representation ... [,] the unlawful genesis of th[e] agreement precludes its [subsequent] validity." *Bernhard–Altmann,* 366 U.S. at 737, 81 S.Ct. at 1607. *See also R.J.E. Leasing Corp.,* 262 N.L.R. B. 373, 380 (1982) (noting in a section 8(a)(2) case that the invalidity of a recognition agreement initially founded on minority support "taints" any subsequent and otherwise valid collective bargaining agreements between the union and the employer).

■ The fact that employer recognition of a minority union is a violation of the Act has given birth to the presumption that a union recognized by an employer does, in fact, represent a majority of the workers in the unit. *See, e.g., NLRB v. Roger's I.G.A.,* 605 F.2d 1164, 1165 (10th Cir.1979) (citing *NLRB v. Cayuga Crushed Stone, Inc.,* 474 F.2d 1380, 1383 (2d Cir.1973)). This presumption is founded on the suppo-

sition that " 'employers normally will not knowingly violate the law.' " *Roger's I.G.A.,* 605 F.2d at 1165 (quoting *NLRB v. Tahoe-Nugget, Inc.,* 584 F.2d 293, 303 (9th Cir.1978), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 290 (1979)). An employer faced with a claim of union majority support may ask to check the authorization cards on which the claim is based and may rely on those cards in choosing to recognize the union. *See NLRB v. Gissel Packing Co.,* 395 U.S. 575, 601–10, 89 S.Ct. 1918, 1933–38, 23 L.Ed.2d 547 (1969). Or, even after checking the cards, the employer may refuse to grant recognition and leave the union to pursue an election. *Linden Lumber Division v. NLRB,* 419 U.S. 301, 309–10, 95 S.Ct. 429, 433–34, 42 L.Ed.2d 465 (1974). An employer who fails to take either of these steps, choosing instead to recognize the union in reliance on its claim of majority support, therefore becomes rightfully subject to a presumption that it has recognized a majority union.

■ The duration and effect of the presumption of majority status depends on the procedure used to accord recognition to the union. When a union is certified following a Board-supervised election, it is well settled that the presumption of majority status generally remains irrebuttable for one year. *See Fall River Dyeing & Finishing Corp. v. NLRB,* — U.S. —, —, 107 S.Ct. 2225, 2232, 96 L.Ed.2d 22 (1987); *Brooks v. NLRB,* 348 U.S. 96, 98, 75 S.Ct. 176, 178, 99 L.Ed. 125 (1954); *Cayuga Crushed Stone,* 474 F.2d at 1383.[2] When an employer voluntarily recognizes a union, however, the period of irrebuttably presumptive majority has been set at a less definite "reasonable time." *See id.* at 1383. *See also NLRB v. All Brand Printing Corp.,* 594 F.2d 926, 929 (2d Cir.1979) (recognizing similar presumption following

---

2. Even the irrebuttable presumption of majority support that normally follows a Board election for one year is inapplicable in the presence of "unusual circumstances." *Cayuga,* 474 F.2d at 1383 (citing *Brooks v. NLRB,* 348 U.S. 96, 75 S.Ct. 176). *See also NLRB v. Eastern Connecticut Health Services, Inc.,* 815 F.2d 517, 519 (2d Cir.) (per curiam), *cert. denied,* — U.S. —, 108 S.Ct. 140, 98 L.Ed.2d 97 (1987). Moreover,

the respondent conceded at oral argument that the presumption that an employer would only knowingly recognize a majority union would not apply in cases marked by "extenuating circumstances." As we discuss, we believe that evidence of the union's misrepresentation in this case constitutes unusual and extenuating circumstances.

an employer's agreement to recognize a union in settlement of an unfair labor practice charge); *NLRB v. Wilder Construction Co.*, 804 F.2d 1122, 1124 (9th Cir.1986). During the reasonable time period following the recognition of the union, evidence of changes in the union's status among the workers generally will not be considered. *See All Brand*, 594 F.2d at 929; *Cayuga*, 474 F.2d at 1383–84.

The policy behind either rule, of course, is that " 'a bargaining relationship once rightfully established must be permitted to exist and function for a reasonable period in which it can be given a fair chance to succeed.' " *Id.* at 1383 (quoting *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 705, 64 S.Ct. 817, 819, 88 L.Ed. 1020 (1944)). Although such a rule may limit the freedom of employees to refrain from collective activity or to seek other representation during the period of presumptive majority support, *see* 29 U.S.C. § 157, "there is a competing interest in providing stability for bargaining relationships [that] have been lawfully established." *Cauyga*, 474 F.2d at 1384. *See also Fall River Dyeing & Finishing*, —— U.S. at ——, 107 S.Ct. at 2233 (presumptions are intended to " 'promot[e] stability in collective-bargaining relationships, without impairing the free choice of employees' ") (quoting *Terrell Machine Co.*, 173 N.L.R.B. 1480, 1480 (1969), *enf'd*, 427 F.2d 1088 (4th Cir.), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91 (1970)). *Cf. NLRB v. Financial Institution Employees of America*, 475 U.S. 192, 208–09, 106 S.Ct. 1007, 1017, 89 L.Ed.2d 151 (1986) (noting that " 'as a matter of national labor policy[,] ... bargaining stability and the principle of majority rule may limit the timing of employee challenges to their certified bargaining representative's majority status' ") (quoting lower court opinion with approval).

■ As the language quoted and the policies discussed above indicate, the operation of such rules and presumptions must be limited to those bargaining relationships that have indeed been *"lawfully* established." *Cayuga*, 474 F.2d at 1384 (emphasis added). *See also All Brand*, 594 F.2d

at 929 (noting that an employer should be bound by a duty to bargain for a reasonable time when its recognition of a union has been "valid" ); *NLRB v. A. Lasaponara & Sons, Inc.*, 541 F.2d 992, 995 & n. 7 (2d Cir.1976) (imposing a duty to bargain and an irrebuttable presumption of union majority upon an employer when there was no question as to whether the union's majority status existed at the time of recognition), *cert. denied*, 430 U.S. 914, 97 S.Ct. 1325, 51 L.Ed.2d 592 (1977). *Cf. Franks Bros.*, 321 U.S. at 705, 64 S.Ct. at 819 (noting that the policies underlying the Act dictate that bargaining relationships "rightfully established" be given an opportunity to succeed without attack). Otherwise, the interest in protecting bargaining relationships could not justifiably outweigh the burdens on employee freedom that flow in some circumstances from the imposition of a period of irrebuttably presumptive union majority support. Even the Board in this case acknowledged that such an irrebuttable presumption of union majority—and the accompanying inescapable duty to bargain —should only attach in cases in which "an employer has *validly* extended recognition to a union...." 282 N.L.R.B. No. 145, at 3 (emphasis added). Indeed, in all of the cases cited thus far, the union enjoyed the presumption of majority support after having been designated as the sole bargaining agent of the employees through some process that carried with it certain indicia of reliability—a Board-supervised election, a Board-sanctioned settlement of an unfair labor practice charge, or an unimpeachable voluntary recognition by an employer of a union that did, in fact, represent a majority of the workers in the appropriate unit. *Cf. NLRB v. Independent Ass'n of Steel Fabricators, Inc.*, 582 F.2d 135, 150 (2d Cir. 1978) (establishing a rebuttable presumption of majority status for an incumbent union that had been a party with the employer to a previous collective bargaining agreement), *cert. denied*, 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979).

We therefore must decide in what instances an employer who has voluntarily recognized a union should be allowed to challenge the validity of the union's status

as of the time of the recognition and who should bear the ultimate burden of persuasion on that issue in appropriate cases. The ALJ in this case held that "in a refusal to bargain case, the General Counsel has the burden of proving the union's majority." In reaching this conclusion, however, the ALJ relied primarily on a case involving an employer's challenge to an incumbent union that had been a party to previous collective bargaining agreements. *See NLRB v. Dayton Motels, Inc.*, 474 F.2d 328, 331 (6th Cir.1973). The rule announced in *Dayton Motels* is not only inapposite in this case, it is also inconsistent with the rule governing similar situations in this Circuit. *See Independent Ass'n of Steel Fabricators*, 582 F.2d at 150 & n. 32 (placing burden on employers challenging incumbent unions to come forward with some evidence of a "good faith doubt" of continued majority support); *NLRB v. Local 3, Int'l Brotherhood of Electrical Workers (IBEW)*, 362 F.2d 232, 235 (2d Cir.1966) (endorsing a Board procedure requiring that an employer questioning the majority status of an incumbent union "at least present prima facie evidence" of some illegality or impropriety undermining its previous recognition of the union).

Another Board decision relied upon by the ALJ here does, in fact, hold that "in a refusal-to-bargain case the General Counsel has the burden of proving the union's majority." *Stoner Rubber Co.*, 123 N.L.R.B. 1440, 1445 (1959). The Board in *Stoner Rubber* went on to hold, however, that in a case involving a union certified after a Board election, the General Counsel can simply rely on the election results to satisfy its burden for up to one year. *Id.* When that presumption of majority support becomes rebuttable, the Board explained, an employer must then "produce sufficient evidence to cast serious doubt on the union's continued majority status." *Id.* If the employer makes such a showing, it shifts the burden of proving majority status back to the General Counsel. *See id.* The Board's holding in *Stoner Rubber* therefore does not support the ALJ's sweeping conclusion that the burden of proving union majority support invariably

rests upon the General Counsel in all phases of all refusal to bargain cases. Rather, as we discuss later, it offers support for our conclusion that an employer who has voluntarily recognized a union must first produce appropriate evidence casting doubt on the validity of its relationship with and its obligation to the union. The ALJ's conclusion is also inconsistent with other Board decisions indicating that when the union's presumption of majority status is permissibly rebuttable, the onus is on the employer to come forward with evidence casting doubt on the validity of the union's position. *See, e.g., Fertilizer Co. of Texas*, 254 N.L.R.B. at 1382 n. 2; *Tri–City Meats, Inc.*, 231 N.L.R.B. at 768 n. 2; *E.L. Rice & Co.*, 213 N.L.R.B. at 748–50; *Moisi & Son Trucking, Inc.*, 197 N.L.R.B. at 198 n. 2.

In *Moisi & Son Trucking*, for example, the employer chose to extend recognition solely upon the basis of the union's claim of majority support, without an independent card check. *See id.* at 199–200. The employer subsequently challenged the nature of its understanding with the union, but the Board concluded that the employer had failed to introduce sufficient evidence challenging the union's majority at the time of the agreement. *See id.* at 198 n. 2. The Board held that "[o]nce an employer has extended voluntary recognition to a union, ... he will not be heard subsequently to challenge its majority status in an 8(a)(5) proceeding *unless he introduces affirmative evidence* proving a lack of majority at the time of the recognition agreement." *Id.* (emphasis added). *See also Tri–City Meats*, 231 N.L.R.B. at 768 n. 2; *E.L. Rice & Co.*, 213 N.L.R.B. at 748–50 (applying *Moisi* standard in a case involving claim that a union misrepresented its status among the employees). Such a rule does not suggest that an employer who voluntarily recognizes a union should thereafter be precluded *in all cases* from offering any evidence to challenge the nature of the union's support. Rather, it merely suggests that such an employer ought to bear the burden of coming forward to "produce sufficient evidence to cast serious doubt on [the nature of] the union's ... status."

*Stoner Rubber,* 123 N.L.R.B. at 1445. The presumption then loses its force and the General Counsel must demonstrate that the union did in fact enjoy validly obtained majority support at the time in question. *See id.*

■ We therefore believe that in a case such as this one, a shifting burden most appropriately serves the competing interests. *See Fall River Dyeing & Finishing,* —— U.S. at ——, 107 S.Ct. at 2232 (noting tension between bargaining stability and employee freedom inherent in application of presumptions). Once an employer voluntarily recognizes a union, that employer should bear the burden of coming forward with any evidence challenging the legitimacy and enforceability of that recognition. An employer "attacking the legality of [its] recognition of a union should at least present prima facie evidence of [a union] illegality [or misrepresentation]." *Local 3, IBEW,* 362 F.2d at 235. Should the employer satisfy this burden by introducing affirmative evidence of union misconduct or overreaching in obtaining recognition, the burden would then shift to the party charging the employer with a refusal to bargain—the General Counsel—to prove by a preponderance of the evidence that the employer's voluntary recognition was otherwise founded on the clear existence of validly obtained majority support for the union. Such an approach is not only consistent with that employed in this Circuit in analogous cases, *see, e.g., Independent Ass'n of Steel Fabricators,* 582 F.2d at 150 & n. 32 (establishing similar shifting burden in cases in which employer demonstrates "good faith doubt" as to majority status of incumbent union); *Local 3, IBEW,* 362 F.2d at 235, it also comports with approaches adopted by other courts and by the Board itself. *See, e.g., Wilder*

*Construction,* 804 F.2d at 1124 & n. 1; *E.L. Rice & Co.,* 213 N.L.R.B. at 748–50; *Stoner Rubber,* 123 N.L.R.B. at 1445. Of course, the evidence that an employer must introduce in such a case cannot merely be comprised of events subsequent to recognition that indicate dwindling employee interest in the union. That would undercut the Act's preference for "promoting stability in collective-bargaining relationships," *Fall River Dyeing & Finishing,* —— U.S. at ——, 107 S.Ct. at 2233, and such evidence should not be considered for at least a reasonable time following an otherwise valid recognition. *See Cayuga,* 474 F.2d at 1383. However, if an employer "produce[s] sufficient evidence to cast serious doubt" on the existence of majority support for the union immediately prior to or contemporaneous with voluntary recognition, when the union purported to enjoy such support, such evidence shifts the burden of persuasion on the issue of majority support back to the General Counsel. *See Stoner Rubber,* 123 N.L.R.B. at 1445.

■ In this case, there clearly was such evidence on the record, both before the ALJ and the Board. It is undisputed that the employer's decision to recognize the union immediately followed the union's misrepresentation that it had majority support. At the time of the May 10 meeting, when Eppolito offered DiPaolo the choice of recognizing a union supported by a majority of Royal Coach workers or undergoing an election campaign, a majority of the workers had not, in fact, signed authorization cards.[3] Irrespective of who introduced the evidence, the fact that the union on May 10 misrepresented its status among petitioner's employees in seeking recognition was more than enough to establish a *prima facie* case of union misconduct or overreaching. The burden of persuasion

---

**3.** In an earlier case, the Board and this Court found and enforced an oral recognition by an employer resulting from a meeting somewhat like that between Eppolito and DiPaolo. See *A. Lasaponara & Sons,* 541 F.2d at 995–96 & n. 7. However, it is not necessary for us to consider whether such a binding verbal recognition could have been found at the May 10 meeting here. It is enough that DiPaolo could have relied—and indeed appears to have relied to

some degree—on the union's misrepresentation in deciding to extend voluntary recognition. The respondent contended at oral argument that no such reliance is evident in the record and that the Board implicitly concluded that the May 10 misrepresentation was not a factor. We believe, however, that reliance can be inferred from the ALJ's opinion and we are troubled by the Board's silence on this matter.

therefore should have shifted to the General Counsel to show that the union had validly obtained the requisite majority support at the time it ultimately secured recognition. The General Counsel obviously could not have satisfied that burden as to the May 10 demand and it did not satisfy that burden with respect to the time on May 11 when the formal recognition agreement was executed. Thus, the ALJ was correct in concluding that the General Counsel, as the party that had instituted the complaint, failed to meet its ultimate burden of persuasion on a critical element of its claim.

When the Board reviewed the ALJ's decision, it correctly began its analysis by noting that the General Counsel had carried its "initial burden" to show majority status by establishing that the employer had voluntarily recognized the union. Then, the Board also correctly inquired whether the employer had adduced affirmative evidence challenging the validity of that recognition. The Board erred, however, in concluding that no such evidence was presented. The Board examined only the evidence that the last six cards were signed on the day the recognition agreement was signed, concluding that this circumstance did not undermine recognition and that it was "speculative" to conclude that the last six cards were obtained after recognition. The Board totally ignored the undisputed evidence that the union had misrepresented its majority status, had obtained the employer's expression of willingness to extend recognition immediately after this misrepresentation, and had secured the last six cards the following day. Thus, the employer's "voluntary" recognition of the union was tainted from the outset and could not be cured by any subsequent showing of union majority support that flowed from that initial misrepresentation. *See Bernhard–Altmann*, 366 U.S. at 737, 81 S.Ct. at 1607; *R.J.E. Leasing Corp.*, 262 N.L.R.B. at 380. It is entirely possible that the union representative here used petitioner's statements of voluntary recognition—either the verbal indications of May 10 or the actual written agreement of May 11—as "a deceptive cloak of authority with which to persuasively elicit additional employee support." *Bernhard–Altmann*, 366 U.S. at 736, 81 S.Ct. at 1607. Whether or not that occurred, a decision by this Court enforcing the Board's order in this case could only increase the temptation for unions in future cases to try to secure binding recognition through such deception or over-reaching. In any event, the evidence of the union's misrepresentation here was sufficient to shift back to the General Counsel the burden of establishing that the union's majority status was validly obtained prior to recognition. Since the General Counsel presented no evidence to sustain this burden, the unfair labor practice was not established. Having concluded that the petitioner in this case did not commit an unfair labor practice, we need not reach the question of the appropriateness of the Board's remedy.

### CONCLUSION

We grant the petition seeking review of the respondent Board's decision and order in this case. For all of the foregoing reasons, we deny enforcement.