**NATIONAL LABOR RELATIONS BOARD, Petitioner, Cross–Respondent,**

v.

**ALBANY STEEL, INC., Respondent, Cross–Petitioner.**

**Nos. 503, 266, Docket 93–4055, 93–4071.**

United States Court of Appeals, Second Circuit.

Argued Oct. 6, 1993.

Decided Feb. 24, 1994.

Nancy J. Gottfried, National Labor Relations Board, Washington, D.C. (Paul J. Speilberg, Deputy Assistant General Counsel, Jerry M. Hunter, General Counsel, Yvonne T. Dixon, Acting Deputy General Counsel, Nicholas E. Karatinos, Acting Associate General Counsel, Aileen A. Armstrong, Deputy Associate Counsel, National Labor Relations Board, Washington, D.C., of counsel), for petitioner/cross-respondent.

Mary Helen Moses, Albany, N.Y. (Ruberti, Girvin & Ferlazzo, P.C., Albany, N.Y., of counsel), for respondent/cross-petitioner.

Before: MINER and ALTIMARI, Circuit Judges, and ELFVIN, District Judge.*

ALTIMARI, Circuit Judge:

The National Labor Relations Board ("NLRB" or "Board") petitions this Court under § 10(e) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 160(e) (1988), for enforcement of its order dated November 9, 1992. The respondent, Albany Steel, Inc. ("ASI" or "the Company") has filed a cross-petition pursuant to § 10(f) of the Act, 29 U.S.C. § 160(f), seeking review of the Board's order.

On April 1, 1991, the Company withdrew recognition from the Shopmen's Local Union No. 534 of the Bridge, Structural and Ornamental Iron Workers ("the Union"), claiming that the Union no longer represented a majority of its workers. The Board found that the Company had committed unfair labor practices by withdrawing recognition from the Union without objective considerations sufficient to establish a good faith doubt of the Union's majority status, and by failing to supply the Union with information it had requested. *See* Section 8(a)(1) and (a)(5) of the Act, 29 U.S.C. § 158(a)(1) and (a)(5). Based on its findings, the Board ordered the Company to bargain collectively with the Un-

---

* Hon. John T. Elfvin, United States District Court for the Western District of New York, sitting by designation.

ion and to provide them with the requested information.

For the reasons discussed below, we agree with the Board's determination that the evidence did not support the Company's withdrawal of recognition. Because, however, we do find sufficient evidence to raise significant doubt of the Union's majority status, we order a Board-supervised secret ballot election. Accordingly, we grant enforcement of the Board's order conditionally upon the Board's holding an election to determine whether the employees of ASI desire to be represented by the Union.

## BACKGROUND

ASI is engaged in the fabrication of steel products and employs approximately 100 production and maintenance employees. The employees have been represented by the Union for more than 25 years. Over the course of that time, the Company and the Union have had a series of three-year collective bargaining agreements ("CBAs"), the last of which expired on November 30, 1988. ASI's president, Peter Hess, has been in charge of negotiating on behalf of the Company, and Robert Thomas, the administrator of the Union, has been in charge of negotiating on behalf of the Union.

On April 1, 1991, the Company withdrew recognition of the Union, claiming that the Union no longer represented a majority of its employees. Because this case requires us to evaluate the validity of the Company's stated reasons for its belief that the Union had lost majority status, we set forth in detail the relevant interactions between the Company and the Union, and the Union and the employees preceding the Company's withdrawal of recognition.

### a. *Background*

In the fall of 1988, a number of ASI employees filed a petition seeking to decertify the Union as their collective bargaining representative. The Board eventually dismissed this petition, based on charges brought by the Union that ASI had, among other things, unlawfully assisted and encouraged the unit employees in their decertification efforts.

The Company was found guilty of the charged unfair labor practices in decisions issued by Administrative Law Judges ("ALJs") on December 5, 1989, and March 13, 1990.

At the same time that the unfair labor practice charges were pending, the Union was being investigated for charges of embezzlement by the local union president. In June 1989, the Union was placed into a trusteeship and Robert Thomas was appointed administrator of the Union and its representative in its negotiations with the Company.

### b. *Bargaining sessions*

On November 30, 1988, while the unfair labor practice charges were pending, the CBA expired and the Union and the Company were involved in negotiations for a successor CBA. There was then a nine-month hiatus in negotiations when Thomas became the Union's new representative.

In April 1990, Thomas wrote ASI president, Hess, seeking dates for additional bargaining sessions. After some bargaining over the ground rules for the negotiations, the parties agreed upon dates for the initial bargaining sessions. The first bargaining session was held on June 28, 1990. The Union was represented by Thomas and three shop stewards, and Hess was chief spokesperson for the Company. Additional bargaining sessions were held on July 10, July 18, and July 31. The July 31 session became heated and Thomas walked out. There followed an exchange of letters between the parties whereby they agreed to return to the bargaining table for an additional session on August 29, 1990.

At that session, negotiations once again became heated and both Thomas and Hess refused to make any further proposals. Thomas gathered up his papers and walked out. That same day, Hess sent Thomas a letter stating that the Company would continue to hold October 2 and 3 open for bargaining as had previously been arranged. Before Thomas received the Company's letter, on September 27, 1990, he sent Hess a letter stating that the Company had rejected the Union's entire contract proposal and had refused to present any additional proposals,

but that the Union was prepared to continue negotiations. Thomas asked Hess whether the Company intended to continue negotiations. Hess received this letter on October 1, and never replied. Thomas failed to show up at the October 2 and 3 bargaining sessions.

### c. Other relevant interactions

Before and during the time that contract negotiations were taking place, there is evidence of certain minimal contact between the Union and the employees. On March 20, 1990, Thomas sent a notice of an "informational meeting" to be held on March 28, 1990 to ASI's employees. Only 36 of ASI's 100 employees attended the meeting. The ALJ found that there were some additional meetings which shop stewards and a small number of employees attended.

On August 20, 1990, Thomas sent letters to Company employees asking for financial support for the Union. He received only one response, from an employee who adamantly refused to pay dues.

The record also contains evidence of various actions by the Union and the Company on behalf of the employees. On September 17, 1990, the Company posted a notice announcing a drug-testing program for its employees. Thomas wrote to the Company on December 15, 1990, opposing the application of this program to the unit employees.

In the Company's September 17 notice, the Company also advised the employees that ASI was implementing an employee assistance program and would conduct meetings with all employees in order to introduce them to the plan. Hess attended a number of these meetings and claimed that, at several of these meetings, employees made disparaging remarks about the Union. Specifically, Hess's suggestion that the employees consult their union was met with the question "What union?" and derisive laughter.

On November 27, 1990, Hess wrote a letter to the Union advising it that the Company intended to grant salary and pension benefit increases. Hess added that the Union's continued silence and its unwillingness to make any additional proposals led him to conclude that it was unlikely that any further bargaining would prove fruitful. Thomas never responded to this letter, and the Company granted the increases.

### d. Company's withdrawal of recognition

On March 14, 1991, the Union sent the Company a letter asking for information about the current unit employees. On April 1, 1991, the Company responded by refusing to provide the information and withdrawing recognition of the Union, claiming a good faith doubt that the Union represented a majority of employees in the unit. The letter cited eight objective bases for the Company's doubt of the Union's status, all related to events recounted above.

In response to the Company's withdrawal of recognition and its refusal to furnish the Union with the requested information, the Union filed unfair labor practice charges with the Board on May 22, 1991. The ALJ rejected the Company's reasons for its good faith doubt that the Union represented the majority of its employees, and found that the Company's actions violated § 8(a)(1) and (a)(5) of the Act.

The Board subsequently issued a short form adoption of the ALJ's decision. In its decision, the Board corrected certain findings of fact and refused to rely on several of the ALJ's reasons for rejection of the Company's evidence of good faith doubt of majority status. The Board ordered the Company to cease and desist from refusing to recognize and bargain with the Union, and further ordered the Company to furnish the Union with the requested information, to bargain on request of the Union, and to post an appropriate remedial notice.

The Board now applies for enforcement of its order issued against the Company. The Company cross-petitions challenging the Board's order.

### DISCUSSION

In its petition, the Board claims that its bargaining order should be enforced because ASI's withdrawal of recognition from the Union was not supported by objective considerations sufficient to establish good faith doubt

of the Union's majority status. ASI challenges the order, claiming that there was significant evidence to support its conclusion that the Union had lost its majority support. For the reasons discussed below, although we are not convinced that there was sufficient evidence to justify the employer's withdrawal of recognition, we do find that there was significant evidence placing the Union's majority status in doubt, and order an election to definitively settle the issue of the employees' wishes.

■■■ The National Labor Relations Act mandates that an employer bargain collectively with a union representing the majority of the employer's workers. *See* Section 8(a)(5) of the Act, 29 U.S.C. 158(a)(5) (providing that it is unfair labor practice for employer to "refuse to bargain collectively with the representatives of his employees"). If the union, however, represents only a minority of the employer's workers, the employer is not only not bound to bargain collectively with the union, but such bargaining constitutes an unfair labor practice. *See Royal Coach Lines, Inc. v. NLRB,* 838 F.2d 47, 51 (2d Cir.1988) ("[E]mployer recognition of a minority union is a violation of the Act....."). Accordingly, the majority status of a union is of key import to an employer.

A certified union enjoys a presumption of majority status. *See Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 37, 107 S.Ct. 2225, 2233, 96 L.Ed.2d 22 (1987). That presumption is generally irrebuttable for one year. *See id.;* Robert A. Gorman, *Basic Text on Labor Law, Unionization & Collective Bargaining* 108 (1976). After that year is concluded, one of the ways an employer who wishes to withdraw recognition may rebut the presumption is "by presenting sufficient evidence to show that the refusal to bargain was based on a serious good faith doubt of the union's majority." *NLRB v. Glover Bottled Gas Corp.,* 905 F.2d 681, 685–86 (2d Cir.1990) (quotations omitted). An employer must come forward with "clear and convincing" evidence of this alleged loss of union support. *See Superior Bakery, Inc. v. NLRB,* 893 F.2d 493, 497 (2d Cir.1990) (citation omitted). Whether the evidence demon-strated a sufficient basis to doubt the union's status must be determined in light of the overall circumstances.

"The 'determination of the sufficiency of the employer's evidence regarding loss of majority status or good faith doubt is a question of fact for the Board which is subject to limited review.' " *Glover Bottled Gas Corp.,* 905 F.2d at 686 (citations omitted). The Board's "determination must be affirmed if supported by substantial evidence [on] the record as a whole." *NLRB v. Windham Community Memorial Hosp.,* 577 F.2d 805, 811 (2d Cir.1978) (citations omitted); *see also United Food & Commercial Workers Dist. Union Local One v. NLRB,* 975 F.2d 40, 44 (2d Cir.1992). This Court has interpreted this substantial evidence test to mean that " 'even if we disagree with the Board's findings, reversal based upon ... [a] factual question will only be warranted if, after looking at the record as a whole, we are left with the impression that no rational trier of fact could reach the conclusion drawn by the Board.' " *Glover Bottled Gas Corp.,* 905 F.2d at 684 (quoting *NLRB v. Springfield Hosp.,* 899 F.2d 1305, 1310 (2d Cir.1990)).

Guided by the above standards, we review the Board's determination that the employer's evidence regarding its good faith doubt was insufficient to rebut the presumption of the Union's majority status.

I. *Analysis of Company's Evidence of Doubt*

■ In support of its good faith doubt about the Union's majority status, the Company cites the following eight factors: (1) the Union's internal problems; (2) the failure of the employees to pay Union dues; (3) the lack of contact between the Union and the employees; (4) the failure of the Union to file grievances on behalf of any employees; (5) Thomas's surface bargaining with the Company; (6) the Union's unwillingness and inability to represent employees; (7) the employees' sentiment against the Union; and (8) the lack of evidence of the Company's anti-union animus.

The Company contends that these factors when viewed together support its good faith

doubt of the Union's majority support. The Board rejected this assertion, and instead accepted the ALJ's conclusion that the Company's asserted bases for its actions "were inadequate foundations on which to infer a good faith doubt." In order to evaluate the Board's conclusions, we must ourselves review each of the factors cited by the Company.

We begin by dismissing out of hand certain of the Company's factors as unsupported by the record before us. Regarding the Company's claim that there was a lack of contact between the Union and the employees, the record indicates that at least one informational meeting was held on March 28, 1990. Furthermore, after hearing testimony from Thomas and certain shop stewards, the ALJ determined that there were some meetings which shop stewards and a small number of ASI's employees attended between the last bargaining session on September 25, 1990 and March 1991.

Also, the record belies the Company's claim that the Union was unwilling to represent the employees. Thomas attended six bargaining sessions on behalf of the employees, and sent a letter to the Company on December 15, 1990 opposing the application of the Company's drug testing program to the unit employees. Furthermore, we reject the inference the Company asks us to draw from the fact that Thomas took no action concerning the Company's proposed unilateral implementation of the wage increase. We find Thomas's inaction in this regard easily explained by his testimony that he decided to let the wage increase go into effect because the employees had not received a wage increase for a year.

Finally, we also reject the Company's reliance on the Union's internal problems. Specifically, the Company claimed that it relied on "its understanding that Local 534 no longer has officers, and is essentially defunct as a local." The Company cannot, on the one hand argue that it was fully prepared to enter into a new CBA with the Union, and on the other hand claim that it thought the Union was defunct.

We next consider the remaining five factors relied upon by the Company in its decision to withdraw recognition of the Union.

a. *Thomas's surface bargaining*

The Company relies on what it terms Thomas's "surface bargaining" to support its good faith doubt of the Union's majority status. Specifically, the Company relies on Thomas's failure to attend two previously scheduled bargaining sessions and his exiting of two other sessions to argue that Thomas obstructed consummation of the agreement because he knew the Union could not obtain ratification.

Although Thomas's actions may be explained by the Company's strained logic, other evidence in the record supports an alternative and more likely explanation for Thomas's behavior. The two bargaining sessions that Thomas left had become heated and the parties had seemingly reached an impasse. Accordingly, it appears probable that Thomas's departure was merely the result of frustration or a tactical bargaining decision. Furthermore, considering the Company's failure to respond to Thomas's September 27 letter asking whether negotiations were continuing, Thomas may have not attended the October 2 and 3 sessions based on a conclusion that the Company no longer wished to negotiate. Given these facts, we agree with the Board's rejection of this factor as a basis for supporting Thomas's good faith doubt.

b. *No financial support for the Union*

The Company argues that the fact that no Union members were paying dues was indicative of a loss of majority support for the Union. The Board rejected the Company's reliance on this factor, attributing the cessation of Union dues to other factors. Specifically, the Board notes that after the parties' contract expired in November 1988, the Company stopped checking-off union dues. In addition, the Board notes that Thomas told the employees that there was no need for them to pay dues directly, inasmuch as there was no bargaining agreement in effect. We are not totally persuaded by the Board's argument.

We recognize that in certain circumstances, the employees' failure to give a union financial support is not a factor that a Company can reasonably treat as an indication that the union has lost its majority status. *See, e.g., Koenig Iron Works,* 681 F.2d at 142–43 (employees' nonpayment of union dues not evidence of union repudiation where surrounding circumstances suggest a different explanation). We also recognize, however, that where absolutely no employees are paying union dues, and where the union has sought financial support from the members and received only one reply which was resoundingly negative, it is not unreasonable for an employer to question the union's majority status. *See, e.g., Thomas Indus., Inc. v. NLRB,* 687 F.2d 863, 868 (6th Cir.1982) (noting rapid or large decline in number of dues check-off authorizations may be indicative of loss of support). Accordingly, we find unpersuasive the Board's argument that this factor would not support ASI's good faith doubt of the Union's status. We note, though, that this factor by itself is not enough to justify the Company's withdrawal of recognition.

### c. *Lack of grievance filings*

The Company claims that the lack of effort on the Union's part to police employee rights should support its claims of a good faith doubt of the Union's majority status. There is no doubt that a Union's failure to file grievances may properly be considered in evaluating an employer's good faith doubt. *See, e.g.,* Gorman, *Labor Law* at 111. The Board, however, rejected the Company's reliance on this factor, concluding that because the Union had not filed grievances during the term of the contract, a post-contract failure to file grievances constituted no change in the Union's practice. Although there is merit to this reasoning, we note that the record indicates that the Union's failure to file grievances began in 1988. Before that point, the Union was actively involved in policing employee rights. Accordingly, the failure to file grievances did constitute some change from prior practice, and does provide some support for ASI's position.

### d. *Employee sentiment*

Expression of employee sentiment against the Union is another factor that the Company relies on to support its good faith doubt of the Union's majority status. Hess testified that at meetings about the employee assistance program, after he suggested that the employees consult their union, employees asked "What union?," laughed, and suggested that they were no longer represented by a union. Assuming that all the employees present at the meetings Hess attended voiced these opinions, it could be said that 42 employees expressed these sentiments. In addition, four employees testified that they stopped hearing about the Union and that they felt that there was no Union.

The ALJ rejected the Company's reliance on this factor, concluding that there was no indication that the comments represented the views of a numerical majority of the workers. The ALJ also refused to credit any statements made to Hess because of the previous unfair labor practices. The Board disavowed these findings in its order, but did not indicate its view of the relevance of the employee sentiment. Now, the Board argues that the statements, although possibly indicating employee dissatisfaction with the Union, did not constitute repudiation by a majority of the employees.

Expression of employee sentiment against a union is the most persuasive evidence supporting an employer's good faith doubt of the union's lack of majority status. *See, e.g., Harley–Davidson Transp. Co.,* 1985 WL 45975, at *2, 1985 NLRB Lexis 817, at *6 (NLRB Jan. 22, 1985) (finding petition signed by majority of employees indicating their desire to no longer be represented by union sufficient evidence supporting employer's good faith doubt). The expressions of employee sentiment usually relied upon by the Board are clear statements of repudiation of a union. *See id.* We recognize that the employees' expressions in this case do not amount to such an unambiguous rejection of the Union. The statements do, however, indicate more than mere dissatisfaction with the Union. Viewing the statements in light of the other particular circumstances of this case, we wonder whether the employees nev-

er bothered to express strong, clear repudiation of the Union simply because they thought the Union no longer existed. Accordingly, unlike the Board, we do not totally discount the statements in our analysis of the employer's good faith doubt.

### e. *Lack of unfair labor practices*

In listing the factors supporting its good faith doubt of the Union's majority status, the Company notes that there was no longer any evidence of the Company's anti-union animus. Although this factor prevents us from dismissing any evidence of a decline in Union support as due to the Company's unfair labor practices, it is not itself evidence that the Union lost majority status.

### f. *Conclusion*

In sum, we have rejected five of the factors that the Company relied on to support its good faith doubt: (1) the Union's internal problems; (2) the lack of contact between the employees and the Union; (3) Thomas's surface bargaining; (4) the Union's unwillingness to represent employees; and (5) the lack of the Union's anti-union animus. Unlike the Board, however, we have not rejected the employer's reliance on the evidence of employee sentiment that there was no union, the absolute lack of financial support, and the Union's failure to file grievances. The cumulative effect of these three factors provides somewhat persuasive evidence of ASI's good faith doubt. Even so, given the very strict standard that the Board requires an employer to meet before a withdrawal of recognition, and the great deference that we give Board determinations on whether the standard has been met, we decline to disagree with the Board's determination that the Company failed to prove good faith doubt to support a withdrawal of recognition.

### II. *New Election*

In making the above finding, however, we cannot ignore the evidence that a previously active union has failed to secure a new CBA since November, 1988, has failed to secure any financial support since the last CBA expired, and has failed to file any grievances on behalf of the unit employees. That evidence of the Union's insignificant presence at ASI, combined with the employees' comments about the Union creates a strong impression that a majority of ASI's employees stopped supporting the Union, but, because they assumed it had disappeared, never bothered to explicitly repudiate the Union.

The Company, perhaps anticipating our tendency to defer to the Board's findings regarding evidence supporting withdrawals of recognition, yet recognizing the unusual circumstances of this case, suggests that as an alternative to enforcing the Board's order we order a Board-supervised election to determine the Union's status. This option would quell our uncertainty about the Union's majority status, while allowing us to give deference to the Board's finding that there was insubstantial evidence in the record to support the Company's decision to withdraw recognition. More importantly, it would further the Act's policy of protecting employee free choice.

This proffered option, however, has serious implications. The Board applies the same reasonable good faith standard for ordering an election, for an employer's withdrawal of recognition, and for an employer's polling of employees. *See Texas Petrochemicals Corp.,* 1989 WL 224426, at *3–4, 1989 NLRB Lexis 636, at *10–11 (NLRB Sept. 29, 1989). Accordingly, by ordering an election in this case, where we admittedly found insufficient evidence to support the Company's withdrawal of recognition, we would be advocating a lower standard than the one required by the Board for ordering an election. Although we are always reluctant to disagree with the Board in matters of labor law policy, we find the Board's application of the same standard to each of these situations problematic.

By applying the same standard to each action, the Board creates a situation where the employer will almost never request an election. Because in order to be granted an election an employer must set forth the same proof needed to withdraw recognition, an employer has no incentive to request an election before withdrawing recognition. We are not the first court to notice the peculiar incentives that the Board's identical stan-

dards generate. *See Mingtree Restaurant, Inc. v. NLRB,* 736 F.2d 1295, 1297 (9th Cir. 1984) (finding Board's application of same standard to elections, employer polls, and withdrawals of recognition "untenable"); *Thomas Indus., Inc. v. NLRB,* 687 F.2d 863, 867 (6th Cir.1982) (same). *See also,* Joan Flynn, "A Triple Standard at the NLRB: Employer Challenges to an Incumbent Union," 1991 *Wis.L.Rev.* 653, 690 (criticizing Board's application of same standard, and advocating lower standard for elections).

Noting the Board's own feelings that the election is the most reliable indicator of employee preferences, *see NLRB v. Gissel Packing Co.,* 395 U.S. 575, 596, 89 S.Ct. 1918, 1931, 23 L.Ed.2d 547 (1969), we feel that employers should be induced to take this course of action to test their belief that the Union has lost majority status rather than simply withdrawing recognition. We think that where, as here, the employer has come forth with objective evidence that there is a lack of union support on the part of a substantial number of employees, an election is warranted. By requiring this lesser showing of objective evidence of a good faith doubt in order for the employer to request an NLRB election, an employer would sooner take that course of action than withdraw recognition and risk a chance of being found guilty of an unfair labor practice. Because all that is at issue in this case is a Board-supervised election, we leave the discussion of the NLRB's standard for employer-conducted polls to another day.

In conclusion, although we agree with the Board's finding that there was insufficient evidence to support the Company's withdrawal of recognition, we find there to be sufficient evidence placing the Union's majority status in doubt to support the ordering of an election. *Cf., Texas Petrochemicals Corp. v. NLRB,* 923 F.2d 398, 402 (5th Cir.1991) (allowing polling of employees when lesser showing of evidence of loss of union support than necessary to justify withdrawal of recognition); *Mingtree,* 736 F.2d at 1299 (same); *Thomas Indus.,* 687 F.2d at 867 (same). We recognize that such action is at odds with current Board practice, and although we are hesitant to disagree with the Board, dis-

agreement is preferable to enforcing a remedial bargaining order in the face of such doubt of the Union's majority status.

We have examined the Company's remaining contentions and find them to be without merit.

### CONCLUSION

Based on the foregoing, we grant enforcement of the Board's order conditionally pending the results of a Board conducted election to be held within 90 days after our order becomes final. *See, e.g., NLRB v. Superior Fireproof Door & Sash Co.,* 289 F.2d 713, 724 (2d Cir.1961). The Company will post a notice of the upcoming election. If the employees choose the Union, the Company will immediately begin abiding by the Board's order.